STRATTON'S INDEPENDENCE, Limited, v. DINES et al.

(Circuit Court of Appeals, Eighth Circuit. February 20, 1905.)

No. 2,083.

1. PLEADING—CONFESSION AND AVOIDANCE.

A separate affirmative defense, complete in itself, in the nature of a confession and avoidance of plaintiff's cause of action, if good in law, defeats the action, notwithstanding a plea of the general denial accompanying the same.

2. SAME—REPLICATION—AVOIDANCE OF AFFIRMATIVE PLEA.

A replication which, while denying certain averments of fact contained in an affirmative defense, does not avoid the legal effect of such defense, presents no issue of fact for the jury.

3. SAME—JUDGMENT ON PLEADINGS—WHEN LIABLE.

Judgment on the pleadings may be entered on motion where a party is, on all the pleadings, entitled to judgment.

[Ed. Note.—For cases in point, see vol. 39, Cent. Dig. Pleading, §§ 1048–1077.]

4. SAME.

Injury or damage to plaintiff as a result of fraudulent representations is a necessary prerequisite of recovery in an action for deceit.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, § 24.]

5. SAME—MEASURE OF DAMAGES.

The measure of damages for deceit in a contract of sale is not the difference between the contract price and the reasonable market value of the property if it had been as represented, but is merely the difference between the actual value of what the buyer parts with and the actual value of what he receives under the contract.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 60–62.]

6. SAME—DAMAGES.

Deceit in the sale of mining property is not ground of action, where the seller receives in exchange for his mines merely the stock of a corporation organized to buy the same, and no other stock than that given him is issued, except seven shares allotted from the reservation for working capital to the seven incorporators, and at the time of the conveyance the corporation has no assets or property other than the mining properties so conveyed. In such case no damages are suffered.

7. SAME.

Defendant's decedent sold mining properties to plaintiff, which was a corporation organized merely to purchase such properties, for its stock. By a separate contract, with which plaintiff had no concern, decedent authorized another corporation to sell his stock on such terms as to realize a liberal commission for itself, and as much over a fixed minimum as possible for decedent. In the event the attempt should fail, decedent was to keep the stock, or not, as he pleased. Meanwhile the mining properties belonged absolutely to plaintiff, and the stock absolutely to decedent. *Held*, that any financial profit in actual cash which decedent made out of sales of plaintiff's stock through the other corporation did not constitute the transaction with plaintiff any other than one of exchange of stock for properties, nor damage plaintiff in such way as to authorize a recovery by it in an action for deceit perpetrated by decedent in the sale of the mining properties to it.

8. CORPORATIONS—DUTIES TO SHAREHOLDERS—RIGHTS OF ACTION.

A corporation, as an artificial entity, owes no fiduciary obligation to its shareholders, except to protect their legal title to shares owned by them by giving proper attention to transfers and reissues thereof; and it is not the duty, nor within the power, of the corporation to prevent

135 F.—29

a shareholder from selling his stock for any price that he may obtain, and any rights of action accruing to a purchaser by reason of representations made by the shareholder in effecting such sale in no manner redound to the corporation.

In Error to the Circuit Court of the United States for the District of Colorado.

For opinion below, see 126 Fed. 968.

This suit was originally instituted by plaintiff in error (hereafter called "plaintiff") against the defendants in error, as executors and trustees under the will of Winfield S. Stratton, deceased, to recover damages alleged to have resulted from false representations made by Stratton concerning certain mining property sold by him to plaintiff. The first count of the complaint is essentially an action of deceit; the second, an action in assumpsit. They present different theories of law for application to one and the same state of facts.

The second count was adjudged bad on demurrer, and abandoned in argument and brief by plaintiff.

The first count is, in substance and effect, as follows: That defendants' testator was the owner of certain mining property located in Cripple Creek mining district, Colo.; that, with a view of selling his property to a corporation to be organized in England, he represented to its promoters, and, after its organization, to its officers and agents, that his property was reasonably worth $10,000,000, and had ore bodies in sight of the value of $7,000,-000; that he caused certain samples of ores taken from his property to be salted, as it is called, so as to indicate a great value, and a false and misleading report made thereon to be presented to the promoters, officers, and agents, so as thereby to induce them to believe in the truthfulness of his representations concerning the value of his property; that the representations so made were false, and known by Stratton to have been false when he made them, and were made by him with intent and for the purpose of inducing the corporation, when formed, to purchase his property for $10,000,000, when, as alleged, it was worth only $4,000,000; that, relying upon the truth of the representations so made, the promoters caused the corporation to be organized, and the corporation, when organized, to purchase his property, paying him $10,000,000 therefor, when it was in fact worth only $4,000,000; that by reason of the facts so alleged the plaintiff was injured in the sum of $6,000,000, for which it prays judgment.

After an unavailing demurrer to this count, the defendant answered, admitting certain formal allegations of the complaint, but denying all allegations constituting the cause of action for deceit, and particularly denying that the mining property was sold to plaintiff for $10,000,000, or that plaintiff was damaged in the sum of $6,000,000, or any other sum, by reason of the matters or things set forth in the complaint.

For a second defense it is alleged that on April 27, 1899, defendants' testator agreed to the organization of a corporation for the purpose of taking over his mining property in consideration of shares of its capital stock to be allotted and issued to him; and, to that end, that he made an agreement with one George Butcher, of London, England. This agreement, after reciting the ownership by Stratton, therein called the "vendor" of the mining claims and properties, as scheduled at the foot of the agreement, proceeds as follows:

"Whereas it has been determined and agreed to register and incorporate a Company with limited liability under the British Companies Acts with a capital of one million one hundred thousand Pounds divided into one million one hundred thousand ordinary shares of one pound each for the purpose of taking over and acquiring and working the said properties, now it is hereby agreed as follows:

"(1) The vendor [Stratton] shall sell and the said intended Company when formed as aforesaid shall purchase * * * the properties" as set out in the schedule hereto.

The second section agrees upon "Stratton's Independence, Limited," as the name of the proposed corporation, and confers upon Stratton the right to purchase at any time within 18 months the 100,000 shares of working capital therein provided for, at £2 per share.

"(3) The consideration for the said sale shall be the sum of one million pounds to be paid and satisfied by the issue and allotment to the vendor of one million shares of one pound each of and in the said intended Company credited as fully paid up, to be numbered 1 to 1,000,000, inclusive."

The fourth, fifth, and sixth sections obligate Stratton to advance the requisite money to defray expenses of incorporating and registering the company, the same to be refunded to him out of proceeds of sale of working capital, to produce evidence of good title to his property, and to warrant title.

"(7) * * * The Company shall immediately after its incorporation in England issue and allot to the vendor or as he shall direct the said one million fully paid shares in the Company but pending the completion of the purchase the allotment shall be regarded as conditional and the certificates shall be deposited at Lloyd's Bank Limited, and held by them until the receipt by the company of the cable hereinafter mentioned. The Company shall also immediately after its incorporation appoint a duly authorized agent as its legal representative in the said state [Colorado] and upon the receipt by the said Company from such legal representative of a cable informing it that such registration as owner has taken place, the said share certificates shall be released by the said bank and handed to the vendor or his nominees."

The eighth section is unimportant.

"(9) There shall be not more than seven and not less than three Directors in England. The vendor shall be one of such Directors and shall join the Board after allotment of the said one million shares and he shall also be appointed managing Director at a salary of four thousand pounds per annum for a period of two years from the incorporation of the Company but so that he shall be entitled to resign at any time." The balance of this ninth clause of the contract relates to the formation of a local board in the state of Colorado, and a method of filling vacancies when they may occur in such local board.

"(10) During the period in which the vendor shall act as managing Director no additional properties shall be acquired by the Company without the written consent of the Vendor."

The eleventh, twelfth, thirteenth, fourteenth, and last clauses of this agreement are unimportant for the present purposes.

It is then alleged that on April 29, 1899, the plaintiff corporation was organized pursuant to the Butcher agreement of April 27th; that the incorporators were seven in number, interested only nominally in the creation and organization of the corporation, each subscribing to but one share of the capital stock of the company; that the capital was fixed, according to the terms of the Butcher agreement, at £1,100,000 sterling, divided into 1,100,000 shares, at the par value of £1 sterling per share. It is further alleged that after the plaintiff corporation was so organized, on May 4, 1899, a tripartite agreement was executed between the newly organized corporation, Stratton, and Butcher, which, after referring to the agreement of April 27th, called the "Principal Agreement," recites and agrees as follows:

"Whereas since the execution of the principal agreement the Purchasing Company has been incorporated in accordance with the intention in that behalf in the Principal Agreement mentioned, And Whereas, by the principal agreement it is provided that one million shares of one pound each in the purchasing Company part of its nominal capital of one million one hundred thousand pounds, which is divided into one million one hundred thousand shares of one pound each shall be allotted to the Vendor as consideration for the sale of the properties therein mentioned and that the Vendor shall have the right to apply for and have allotted to him the whole or any portion of the balance of the one hundred thousand shares for the period and on the terms thereinafter mentioned, and Whereas the subscribers to the Memorandum of Association of the Purchasing Company, having agreed to take seven shares in the purchasing Company, it has been agreed between the

parties hereto that the number of shares over which the Vendor shall have an option as aforesaid shall be decreased by seven shares, and Whereas, it is intended that the one million Shares which by the principal agreement it is provided shall be allotted to the Vendor shall be either allotted to him or as he may in writing direct and Whereas, the purchasing Company has resolved to adopt and carry into effect the principal agreement subject to the before mentioned modifications, Now it is hereby Agreed, as follows:

"(1) Subject as hereinafter mentioned the principal agreement is hereby ratified and adopted by the purchasing Company and shall be binding on the Vendor and the Purchasing Company in the same manner and take effect in all respects as if the purchasing Company had been in existence at the date of the principal agreement and had been a party to the same instead of the said George Butcher.

"(2) The one million shares of One pound each in the purchasing Company which by clause 3 of the principal agreement it is provided shall be allotted to the Vendor shall be issued and allotted to the Vendor or his nominees as he may in writing direct and shall for all purposes be considered as fully paid up, and shall be numbered from 1 to 1,000,000 inclusive."

The third section of this agreement gives the vendor an option for 2 years to buy the 100,000 shares referred to in the Butcher agreement as working capital, less the 7 shares subscribed by the incorporators of the purchasing company. The fourth section provides for the discharge of George Butcher from all further liability under the principal agreement.

The defendants further allege in their second defense that after the execution of the agreement just referred to, on or about May 23, 1899, Stratton duly conveyed his mining properties to the corporation; that the corporation thereupon allotted and issued to Stratton, as the consideration for such conveyance, 1,000,000 shares of its capital stock; that the same was the sole and only consideration which Stratton, or any one representing him, then or at any time received for the mining properties conveyed by him to the corporation; that, while in form the transaction resulted in the conveyance by Stratton to plaintiff corporation of the mining properties, it, in truth and fact, constituted but a change in the manner of Stratton's ownership and possession of the properties; that at the time when the shares were allotted and issued to Stratton the corporation had no assets or property other than the properties so acquired from Stratton; that, in allotting and issuing 1,000,000 shares of its capital stock to Stratton, it parted with nothing of value, except as the shares had value by reason of the ownership by the corporation of the mining properties it had so acquired; that the corporation has never at any time since its incorporation acquired, held, possessed, or owned, and does not now own, possess, or hold, any property or assets of any character, save and except the mining properties, and issues, profits, and emoluments therefrom; that, after the issue and delivery of the 1,000,000 shares of capital stock to Stratton, he remained the owner thereof for a long period of time; that, immediately upon the execution and delivery of the conveyance by Stratton to the corporation, plaintiff entered into full and complete possession of the mining properties, and has continued in the possession and enjoyment of the same ever since. Finally the defendants aver in the second defense that, by reason of the facts so pleaded, the plaintiff has not been damaged in any manner, and cannot maintain this action.

In the view taken of this second defense, the others, relating to the qualification of the executors and the survivability of the cause of action against them, need not be considered. A demurrer was filed to the second defense and overruled.

In due course plaintiff filed a replication, in which it admits the execution of the Butcher and supplemental agreements as alleged; admits that plaintiff corporation was organized with a capital of 1,100,000 pounds sterling, divided into 1,100,000 shares, of £1 each, and that only 1,000,007 shares thereof were ever issued by the corporation; admits "that, at the time said transfer [by Stratton to the corporation] was made, the plaintiff had no assets, and, when the property was transferred to it, it had no assets but said property"; admits that the corporation issued 1 share of its stock to some of the seven directors, and issued 1,000,000 shares thereof to Stratton, but denies that

the 1,000,000 shares were received by Stratton in full payment for the property sold by him, or that the 1,000,000 shares was the sole, only, or any consideration received by Stratton for his conveyance; alleges the real transaction to have been that plaintiff sold and disposed of its capital stock for the sum of $10,000,000, and paid over that amount to Stratton for his mining properties; alleges that certain other agreements, which are set forth in the replication, made cotemporaneously with the Butcher and supplemental agreements, disclose the real contract between the parties, in pursuance of which the property was sold by Stratton to the plaintiff corporation for the full sum of $10,000,000, paid by the corporation to Stratton therefor. It is then averred in the replication that prior to February 2, 1899, Stratton, having conceived a scheme to sell his mining properties to an English corporation to be formed, employed one Verner Z. Reed as a promoter and agent to carry out his scheme; that Stratton induced the Venture Corporation, Limited, of London, and George Butcher and others, to agree to form a corporation in England to be known as "Stratton's Independence, Limited," with a capital of such an amount that enough could be sold to realize $10,000,000, which should go to Stratton for his mining properties; that, in executing this scheme, Stratton made the false representations of facts stated in the complaint, to the promoters and proposed organizers; that, to carry out the scheme to sell his properties for $10,000,000, Stratton entered into certain contracts with Reed, the Venture Corporation, Limited, George Butcher, and William Allen Ramsay, all of which are set out in the replication. These are the agreements referred to in the replication as the ones which disclose the real contract between Stratton and the plaintiff corporation for the sale of, and payment for, the mining properties in question.

The first of these contracts is between Stratton and Verner Z. Reed, referred to hereafter as the Reed agreement, and bears date February 2, 1899. This agreement first recites the fact that Stratton is the owner of certain mining properties, which are there fully described, and then recites that Stratton is desirous of having an English corporation formed through and by the agency of Reed, who is designated as promoter, and the Venture Corporation, Limited, of London, which is designated as the financial agent, for the purpose of acquiring Stratton's mining properties, in order "that the same may be worked, mined and operated thereby, and that the shares of the said corporation so to be formed may be sold on the London market." The agreement then provides that Reed (the promoter) shall immediately proceed to accomplish the purpose of the agreement; that he shall have an expert examination made of Stratton's mining properties by Thomas Arthur Richard, a mining engineer of Denver, Colo., representing the financial agent, and, if the report of the expert shall prove favorable, that Reed and the Venture Corporation shall cause a corporation to be formed, under the British companies acts, to purchase Stratton's mining properties. The agreement then provides that the name of the corporation to be formed shall be "Stratton's Independence Gold Mines, Limited"; that its capital shall be £3,000,000 sterling, divided into shares of £1 each; that it shall have a board of directors, with offices in London, and a local managing board in Colorado; that the expense of the London office, as well as the cost of organizing the corporation and transferring Stratton's properties to it, shall be borne by Reed and the Venture Corporation until they may be reimbursed out of the proceeds of the sale of stock to be set apart for working capital; that 2,500,000 shares of the capital stock shall be allotted to Stratton "in payment for the properties to be by him conveyed to the Corporation"; that these shares shall be deposited in escrow in some London bank pending the transfer by Stratton of his mining properties to the corporation; that the remaining 500,000 shares shall be set aside as working capital to be sold at not less than par. The fourth clause of the agreement is as follows:

"Fourth: The consideration for the said purchase and sale shall be two million five hundred thousand pounds sterling and shall be paid and satisfied by the allotment and issue to the vendor of two million five hundred thousand shares of the stock of the proposed corporation, credited as fully paid up, and as soon as said vendor's shares shall have been duly allotted, issued, and placed in said Lloyds Bank Limited, or with such other depositary as may

be agreed upon the vendor agrees that he will convey the properties above described and the whole thereof, together with all the plants, buildings, machinery and appurtenances thereunto belonging or in any wise appertaining to the proposed corporation by good and sufficient mining deeds and free of all liens, charges and incumbrances whatsoever, thereby vesting in the said proposed corporation the fee simple title thereto." The agreement then obligates Stratton to give, and, in terms, grants, to Reed, the promoter, an option for 18 months to purchase his 2,500,000 shares at the aggregate sum of £2,000,000, to be paid for proportionately as the stock is sold by Reed. It then provides that, as soon as the corporation is formed, the mining properties transferred to it, and Stratton's 2,500,000 shares allotted to him, these shares shall be placed in the hands of a proper person or bank in London, as trustee, to be agreed upon between Stratton and Reed, to be delivered out by such trustee to the promoter, Reed, or to the Venture Corporation, with the consent of Reed, as the same may from time to time be paid for under the terms of Reed's option agreement. The eighth clause of the agreement is in words and figures, as follows:

"Eighth: It is mutually understood that the said option is given for the purpose of enabling the promoter by and with the assistance and co-operation of the financial agent and its allies, connections and associates, to sell the shares covered by and included in the said option on the London market and the promoter does hereby covenant and agree that he will account for and pay over to the vendor, by himself or through the financial agent, sixty per cent. of all monies received or realized from the sale of such stock, over and above the par value thereof and when any part of the said stock shall be sold for more than its face value a statement of such sales shall be rendered to the trustees under the said option, and the promoter and financial agent shall pay to the trustee all sums to which the vendor is entitled on account thereof, for the use of the vendor."

The last clause of the agreement provides, that Reed may make any such agreement as to him seems best with the Venture Corporation, Limited, for the purpose of carrying out the enterprise, but that he shall assign no interest in the contract to any other corporation or person, except to the Venture Corporation, Limited.

The next agreement set out in the replication is between Verner Z. Reed and the Venture Corporation, Limited, and is dated February 9, 1899. This agreement recites the substance of the Reed agreement of February 2, 1899, and the last clause thereof, conferring upon Reed the right to make such agreements and contracts as he may desire with the Venture Corporation, and then, in effect, after making provision for a division of commissions between Reed and the last-named corporation, substitutes it for Reed in the performance of the contract of February 2, 1899.

The replication next sets out in full the Butcher contract of date April 27, 1899. This is the contract set out in the second defense, which has already been analyzed.

Next follows in the replication an agreement, bearing date April 27, 1899, between Stratton and the Venture Corporation, Limited. This agreement, after reciting the making of the Butcher agreement of that date; that Stratton has thereby agreed to sell his mining properties to a limited company to be formed, at the price of £1,000,000, to be satisfied by the allotment to him of 1,000,000 fully paid shares, of £1 each, in the limited company; that Stratton has entered into certain obligations for the payment of certain preliminary expenses in connection with the formation and registration of the corporation to be formed—obligates the Venture Corporation to pay these preliminary expenses for Stratton, and for a period of 18 months to pay all the expenses of the London office, excepting Stratton's salary of £2,000 per annum; the same, however, to be reimbursed to the Venture Corporation when it shall have sold one-half of Stratton's allotment, "as purchase consideration," and after one-half of the working capital shall have been subscribed as in the agreement later provided for. This agreement next provides that Stratton shall deposit in the hands of some person or corporation in the city of London, to be agreed upon, the certificates for the whole of the 1,000,000 shares allotted to him "in respect of the consideration for the said

sale," to be held in trust for delivery to the Venture Corporation or its order as and when the shares are sold and paid for as provided later in the agreement, and, notwithstanding the deposit of stock, and the option given the Venture Corporation to sell the same, that Stratton shall be entitled to exercise all rights of voting, and all other rights incident to the ownership of so many of the said shares as may from time to time remain unsold. It next provides that the Venture Corporation shall for the period of 18 months have the sole option and right of making sales of any and all of Stratton's 1,000,000 shares of stock. It fixes the price at which the Venture Corporation may sell the 1,000,000 shares of stock. It gives it the right to sell the same at such price or prices as it from time to time thinks best, but provides that Stratton is to receive £1.16.0 per share until 666,666 shares have been sold, and thereafter the sum of £2.8.0 per share; the Venture Corporation to have any and all surplus above that which Stratton is so to receive, except that, if any shares shall be sold by it at a price exceeding £2.10.0 per share, it shall pay to Stratton for such shares, in addition to the price above mentioned, a sum equal to three-fifths of the amount of such excess. This agreement, among other things, provides that, if any of Stratton's shares shall remain unsold at the expiration of the term of 18 months, the certificates for the same shall be immediately delivered over to Stratton by the trustee holding the same.

The replication next sets out in full the tripartite supplemental agreement of May 4, 1899, between Stratton, George Butcher, and Stratton's Independence, Limited. This agreement is embodied in the second defense, and has already been analyzed.

The replication next sets out letters of attorney, dated May 4, 1899, executed by Stratton to William Allen Ramsay, in which, after reciting that he had, by the Butcher contract, agreed to sell his mine to a trustee for a corporation to be called Stratton's Independence, Limited, "for the price of £1,000,000, to be satisfied by the issue and allotment to him of 1,000,000 ordinary shares, of one pound each," and after reciting that by the agreement of April 27, 1899 between him and the Venture Corporation, he had granted to that corporation the option to sell any or all of the shares "forming the said purchase consideration" at the price and on the terms therein stated, and, after reciting the agreement requiring the certificates for those shares to be deposited with a person or corporation to be agreed upon, he designates and appoints Ramsay as his attorney in fact, to agree upon such person or corporation (to be called a trustee) to vote his stock from time to time, to transfer his shares as required by former agreements either to the trustee or purchasers thereof, and generally to represent him (Stratton) when dealing with the trustee or the Venture Corporation. Next follows a paper of date June 9, 1899, signed by Stratton, per William Allen Ramsay, as attorney in fact, designating the Anglo-American Debenture Company Limited, to be the depositary of Stratton's stock, pursuant to the provisions of former contracts, and therewith hands to the depositary certificates for 1,000,000 shares of the stock, with a duly executed transfer of the same into the name of the trustee, and authorizes and requests the trustee to forthwith have the stock registered in its own name. He then uses the following language:

"I hereby request you to transfer to the Venture Corporation Limited, or their nominees, as and when required by them all or any of the said shares which by the accounts delivered to you by The Venture Corporation shall be expressed to have been sold by them upon The Venture Corporation complying with the conditions as to transfer and payment which are hereinafter set out."

"You are to forward to me at Colorado Springs, Colorado, U. S. A., or to me at such other place as I may from time to time direct every three months or oftener if required by me in writing, an account showing the number of shares transferred by you, and the amounts received in respect thereof. You are to remit to me, from time to time, in such manner and to such address as I shall direct and at my risk, all moneys shown by the above accounts to be in your hands belonging to me."

Then follow certain mentioned conditions, stating the amount which the Venture Corporation is to pay to the trustee in order to secure the release

of any shares, and also stating that a certain sum received for each share of stock sold shall be accounted for to Mr. Verner Z. Reed as he shall direct.

The replication next sets out an agreement between the Venture Corporation and Verner Z. Reed, of Colorado Springs, in the state of Colorado, of date April 18, 1900, which, after reciting the terms of some prior agreement between them in relation to commissions to be earned in the sale of Stratton's stock, declares that agreement null, and substitutes another for it. This substituted agreement relates exclusively to the settlement between Reed and the Venture Corporation with respect to services rendered by Reed, and is otherwise inconsequential. Next follows an agreement between Stratton and the Venture Corporation, dated April 18, 1900, designated as "supplemental to an agreement of April 27, 1899, between the same parties." This agreement recites the sale and disposition of 592,500 shares of Stratton's stock on the terms of the pre-existing agreement, and that Stratton had received, as the proceeds thereof, certain sums of money. Then follows an agreement by Stratton to sell the balance of his stock out and out to the Venture Corporation "at such a price as with the cash already received on account of sale of shares and dividends already received and to be received by him from the Company, shall make up a total inclusive sum of $10,000,000." The replication then avers that all of the foregoing contracts, except that of February 5, 1899, between Stratton and Reed, were carried out, and "that in pursuance of the contracts above set forth, and their full execution, and in accordance with the original agreement and understanding, the said Stratton did convey to the plaintiff the property herein, and did receive in full satisfaction therefor the full sum of $10,000,000; that in truth and in fact the said Stratton never had the beneficial ownership or any control or disposition, or even possession, of the 1,000,000 shares of capital stock that for a time stood in his name upon the books of the company, but said stock was issued for the sole purpose of carrying out said original transaction, which was to enable the said Stratton to receive the sum of $10,000,000, although apparently receiving 1,000,000 shares of the capital stock of the plaintiff company." The replication then puts in issue the allegations of the answer to the effect that the suit was prematurely instituted, and to the effect that the cause of action did not survive as against the executors.

Afterwards the defendants filed motions (1) to strike out these several replications; and (2) for judgment in their favor on the pleadings. These motions were sustained by the trial court, and judgment was finally rendered in favor of the defendants. The case is brought here by writ of error to secure a reversal of this judgment. The only assignments of error deemed necessary to consider are those challenging the action of the trial court in overruling the demurrer to the second defense, and finally rendering a judgment for the defendants on the pleadings.

Samuel Untermeyer, W. H. Bryant, and Charles J. Hughes, Jr. (Randolph Guggenheimer, Louis Marshall, C. S. Thomas, and H. H. Lee, on the briefs), for plaintiff in error.

Elmer E. Whitted and Henry McAllister, Jr. (L. M. Goddard and Newton S. Gandy, on the brief), for defendants in error.

Before VAN DEVANTER and HOOK, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge, after stating the case as above, delivered the opinion of the court.

Some argument was made at the bar, as well as in briefs, touching the regularity of the practice resulting in the judgment below. It is said that plaintiff pleaded facts in the complaint on which issue was joined in the answer. This is true, and, if there had been nothing more, the case should have been tried to the jury. But besides the denial, the defendants pleaded a separate affirmative defense,

complete in itself, in the nature of a confession and avoidance of plaintiff's cause of action. If that defense is good in law, the action is defeated, notwithstanding the general denial. It is also argued that the replication to the affirmative defense puts in issue certain averments of fact therein contained, and that the issue so made should have been tried to the jury. But manifestly, if the replication does not avoid the legal effect of the affirmative defense, it presents no issue of fact for the jury. The legal sufficiency of the affirmative defense, and of the replication in avoidance of it, are the real questions to be determined by the court.

It is also contended that the trial court was not warranted by any admissible practice in striking out the replication and rendering judgment on the pleadings. The record shows that the replication was stricken out and judgment rendered for defendants by one and the same order, and that no request was made by plaintiff's counsel to file further or amended pleadings. Whether the learned trial judge was technically correct in striking out those parts of the replication specially applicable to phases of the answer other than the second defense, we need not discuss. If, on all the pleadings, taken together, defendants were entitled to judgment, a practice resulting only in such a judgment cannot be substantially wrong. In such circumstances, motion for judgment on the pleadings is a useful and recognized practice. Steinhauer v. Colmar, 11 Colo. App. 494, 55 Pac. 291; Humboldt Mining Company v. American Manufacturing M. & M. Company, 10 U. S. App. 415, 62 Fed. 356, 10 C. C. A. 415.

We are brought, then, to a consideration of the substantial and decisive questions involved in the case—whether the affirmative defense, known in the pleadings as the "second defense," is good in law, and, if good, whether it is avoided by the replication. The conclusion reached on these questions, if favorable to the defendants, will dispose of this case, notwithstanding any or all other assignments of error. This defense, fully detailed in the statement of the case, is substantially that even if defendants' testator made the false representations concerning his mines, as charged in the complaint, the plaintiff was not injured thereby, and sustained no damages as a result thereof.

The preliminary contract of April 27, 1899, between Stratton and Butcher, known as the "principal agreement," and the subsequent ratification of it by the plaintiff corporation after its organization, disclose the purpose of the contracting parties to have been to organize a corporation in London with a capital of £1,100,000 sterling, divided into 1,100,000 shares, of £1 each, which, when formed, should purchase Stratton's mines with 1,000,000 of these shares, leaving 100,000 of them unissued. The principal agreement bound Stratton to make the sale to the corporation when it should be organized, and undertook to bind the corporation, when so organized, to make the purchase on the terms therein stated, namely, for 1,000,000 shares of its capital stock. Within a reasonable time after the execution of the principal agreement, and in conformity with its provisions, plaintiff corporation was organized with the capital

stock as contemplated. The supplemental tripartite agreement made after the incorporation of plaintiff bound the corporation to make the purchase on the terms stated in the principal agreement. Words cannot more clearly express what parties agree upon, than do the words employed in these contracts. Referring to the subject of the sale then under consideration, the parties say:

"The consideration for the said sale shall be the sum of one million pounds, to be paid and satisfied by the issue and allotment to the vendor [Stratton] of one million shares of one pound each of and in the said intended company credited as fully paid up to be numbered 1 to 1,000,000 inclusive."

Nothing is found in either of these contracts remotely suggesting that the corporation should pay Stratton any money or further consideration for his mining properties, excepting the 1,000,000 shares of its capital stock; and nothing is found in them making provision for any sale by Stratton of his stock, or for the disposition of the proceeds of such a sale, if one should be made. The contracts, in plain and unambiguous language, provide for the sale by Stratton of his mines for a fixed and definite consideration. It further appears that the sale was made by Stratton, and that 1,000,000 shares of its capital stock was allotted and issued to him by the corporation pursuant to the terms of the contracts; that the corporation has never issued any of the remaining authorized stock, except 7 shares to qualify the incorporators; and that, when Stratton transferred his mining properties to the corporation and received his allotment of shares, the corporation had no assets, except the properties so transferred to it, and never has since acquired any other assets, except the issues, profits, and emoluments accruing from the operation of the mines so acquired from Stratton.

Such is the state of facts upon which the defendants base their second defense, and they contend that it appears that all that Stratton received from the corporation was shares of stock representing in kind exactly what he transferred to it, and that, as a result, the corporation was not injured or damaged by any false representations, if made by Stratton. If the facts so stated are true—and for present purposes they must be so taken—it appears that, at the time Stratton conveyed his mines to plaintiff corporation, it had no good will or prestige in business, or other assets that gave its stock any value over and above that which the properties actually conveyed by Stratton gave to it. In actions of deceit, injury or damage to the plaintiff, as a result of the fraudulent representations, is a necessary prerequisite to recovery. Fraudulent representations and deceit, if not productive of injury or loss, are moral, not legal, wrongs; or, as often expressed by law writers, "Fraud, without damage, or damage without fraud, gives no cause of action." In Ming v. Woolfolk, 116 U. S. 599, 602, 6 Sup. Ct. 489, 491, 29 L. Ed. 740, the Supreme Court, quoting from Baron Parke in Watson v. Poulson, 15 Jurist, 1111, says:

"The requisites to sustain an action for deceit are the telling of an untruth, knowing it to be an untruth, with intent to induce a man to alter his condition, and his altering his condition in consequence, whereby he sustains damage."

After citing several cases in support of the proposition so announced, the court, speaking of the case before it, says:

"Considered, therefore, as an action for a deceit, it is plain that the case must fail, for, conceding the alleged representations to have been made by the defendant, and to have been false, the plaintiffs were not induced thereby to change their condition, and, moreover, have suffered no damage."

To the same effect is the case of Marshall v. Hubbard, 117 U. S. 415, 6 Sup. Ct. 806, 29 L. Ed. 919.

In order now to determine whether plaintiff, in the circumstances disclosed by the second defense, sustained any injury or damage, it is necessary to advert to the rule governing the measure of recovery in such cases. Whatever may be the measure of damages in actions of deceit in other courts, the rule laid down by the Supreme Court of the United States and this court, in harmony therewith, is that the measure of damages is not the difference between the contract price and the reasonable market value, if the property sold or exchanged had been as represented to be. As said by Mr. Chief Justice Fuller in the case of Smith v. Bolles, 132 U. S. 125, 129, 10 Sup. Ct. 39, 40, 33 L. Ed. 279:

"The measure of damages was not the difference between the contract price and the reasonable market value if the property had been as represented to be. * * * What the plaintiff might have gained is not the question, but what he had lost by being deceived into the purchase."

In Rockefeller v. Merritt, 76 Fed. 909, 22 C. C. A. 608, 35 L. R. A. 633, this court had the same question before it, and there entered into an exhaustive consideration of the authorities, and announced the rule that:

"The true measure of the damages suffered by one who is fraudulently induced to make a contract of sale, purchase, or exchange of property is the difference between the actual value of that which he parts with, and the actual value of that which he receives under the contract. It is the loss which he has sustained, and not the profits which he might have made by the transaction."

Smith v. Bolles, supra, and a large number of other cases, are there cited in support of the proposition announced.

The case of Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113, was an action brought to recover damages for deceit alleged to have been practiced by the defendant in the sale of a gold mine to the plaintiff. Mr. Justice Harlan, in delivering the opinion of the court, reviewed extensively the authorities, both English and American, concerning the true measure of damages in such cases, quoted approvingly from the opinion of Judge Sanborn in Rockefeller v. Merritt, supra, and finally concludes as follows:

"We adhere to the doctrine of Smith v. Bolles. Upon the assumption that the property was not worth what the plaintiffs agreed to give for it, they were entitled to have * * * a verdict and judgment representing in damages the difference between the real value of the property at the date of its sale to the plaintiffs and the price paid for it, with interest from that date, and, in addition, such outlays as were legitimately attributable to the defendant's conduct, but not damages covering 'the expected fruits of an unrealized speculation.' If the plaintiffs were inveigled by the fraud of the defendant into purchasing this mining property, a judgment of the character

just indicated would make them whole on account of the loss they sustained. More they are not entitled to have at the hands of the law in this action."

Applying the rule thus authoritatively laid down, plaintiff's only injury or damage in this case is the difference between the value of the 1,000,000 shares issued by it to Stratton, and the value of the property received in exchange therefor from Stratton. If that which plaintiff received is equal in value to that which it paid, clearly, plaintiff sustained no injury by the transaction.

It conclusively appears from the facts pleaded in the second defense that all the issued capital stock was allotted to Stratton for his mines, and that this stock had no other or greater value than the properties acquired from him. The plaintiff acquired the legal title by deed, and returned to Stratton, in other evidences of title, all the beneficial interest in the same property, and nothing more. It therefore gave back, in substance, that which it received, and no more.

Argument is made that the 7 shares allotted from the reservation for working capital to the 7 incorporators changes the situation; but this suggestion does not impress us. The value of the 1,000,000 shares allotted to Stratton was not increased by the allotment of the 7 shares to the incorporators. The second defense under consideration contains an averment (admitted in the replication) that, at the time of Stratton's conveyance to the corporation, it had no assets or property other than the mining properties conveyed to it. Obviously, therefore, the transfer of these 7 shares to the incorporators was a formality resulting in no substantial increase of assets.

The conclusion reached on this part of the case follows so logically and irresistibly from the established rule governing the measure of damages in actions of deceit that we do not deem it necessary to attempt to harmonize or apply the many English and American cases to which our attention has been called. It is sufficient to say that they, generally speaking, are suits to recover from stockholders unpaid portions of capital stock, or to hold directors liable for fraudulent disposition of capital stock or fraudulent overvaluation of property for the purpose of defeating some constitutional or statutory enactments against fictitious issues of stock, or to hold promoters to liability for secret profits, and other cases of like kind. We have carefully considered those cases, as well as the arguments of counsel resting upon them, and find in the equitable principles announced in them nothing in conflict, but much in harmony, with the conclusion reached in this case. This is a case (in many respects different from any of them) in which a corporation, as an entity distinct from its shareholders, sues defendants, in an action at law, for an injury which it claims to have sustained by reason of fraud and deceit practiced directly upon it by their testator, in the sale of property by him to the corporation.

For the reasons given, we are unanimously of opinion that the second defense, as pleaded, is a good defense to plaintiff's cause of action.

The question remaining for consideration is whether this defense is avoided by facts pleaded in the replication. The contention, as stated in the replication, and as argued by counsel, is that contemporaneously with the execution of the Butcher "principal agreement" and the tripar-

tite or "supplemental agreement," which form the basis of the second defense, certain other agreements, which are fully set forth in the replication, were made by Stratton and others, which disclose that he was to, and did, receive from the plaintiff corporation $10,000,000 in money, and not 1,000,000 shares of its capital stock, as the consideration for the sale of his mining properties. What, now, do these agreements disclose? The Reed agreement of February 2, 1899, seems to be the initiation of Stratton's undertaking. Its preamble discloses the ostensible general purpose to have a corporation formed under the British companies acts by Reed (who is called the "promoter"), and his associate, the Venture Corporation, Limited, "for the purpose of acquiring [Stratton's mining properties] that the same may be worked, mined and operated thereby; and that the shares of the said Corporation so to be formed may be sold on the London market." This agreement then, provides for the organization of a corporation with a capital of £3,000,-000 sterling, divided into 3,000,000 shares, of £1 each; that 2,500,000 of these shares should be allotted to Stratton "in payment for" his mining properties; that Reed should have an option, for and during 18 months, to purchase these shares from Stratton at prices specified, and that in the meantime these shares, after allotment to Stratton, should be deposited with some depositary in London, with provisional transfers ready for convenient delivery to purchasers; and that, if any of the shares should remain unsold at the expiration of the 18 months, the same should be returned to Stratton. The next agreement, of February 9, 1899, is between Reed and the Venture Corporation, Limited. It recites by way of preamble the substantial provision of the Reed agreement, and then obligates the Venture Corporation to proceed with the organization of the proposed corporation in place of Reed. It then assigns to the Venture Corporation Reed's option to purchase Stratton's stock in the contemplated corporation, carefully providing for substantial participation by Reed in the commissions to be earned on sales to be made by the Venture Corporation.

Each of these agreements, it will be noticed, discloses two purposes—one for organizing a corporation, and the sale of Stratton's mines to it for a certain number of shares of its stock, and the other for selling these shares, when secured, on the London market. There is nothing in either of them remotely suggesting that the corporation, when organized, should have anything to do with the sale of the stock when issued, or that the sale should be avoided if the stock should not be sold. On the contrary, the sale was to be complete by itself; the title was to be fully vested in the corporation when and as soon as the agreed number of shares should be issued to Stratton. Stratton was to assume the chances of his agents making the sale of his stock. In so far as they failed to do so or to exercise their option within 18 months, the stock was to be delivered by the depositary back to Stratton. Moreover, it does not seem to have been intended in these early agreements that $10,000,000 should be the measure of Stratton's receipts for stock sold. On the contrary, his minimum was to be £2,000,000, and his maximum that much plus 60 per cent. of all moneys realized from the sale of his stock over and above its face value. In other words, the original scheme was to sell the mines for a certain

fixed amount of the capital stock, and afterwards to so deal with this stock on the London market as to realize for Stratton from credulous investors (not from the corporation) the largest possible sum. Accordingly, giving to these first agreements, which, although abandoned, are relied upon by counsel as disclosing the original purpose of the parties, their plain and natural meaning, it is apparent that the original purpose was to make separate transactions of the sale of the mines to the corporation, and the sale of the stock to the public. In these initiative agreements we find nothing suggestive of the sale of the mines to the proposed corporation on any other terms than for a specified number of its corporate shares, and nothing suggesting that the corporation should have anything to do with the sale of the stock to be issued to Stratton. But whatever may have been the purpose of these first agreements, they were never carried into execution, but were abandoned, and the new scheme evidenced by the contracts of April 27th and May 4th was devised. These last-named contracts make no provision for disposing of the stock which Stratton should receive for his mines. They make no mention of Reed or the Venture Corporation. They relate exclusively to the details of the organization of an English corporation, and to the terms and conditions of the proposed sale by Stratton to it. The first or "principal agreement" was one whereby Stratton contracted with Butcher, a promoting agent, to sell his mining properties to a corporation to be formed. The consideration was fixed in unambiguous terms as "one million pounds to be paid or satisfied by the issue and allotment to the vendor of one million shares of one pound each of and in the said intended company, credited as fully paid up, numbered one to one million inclusive." The next or supplemental agreement was between Stratton, Butcher and the corporation created pursuant to the principal agreement, wherein the parties make the following recital:

"Whereas, by the principal agreement, it is provided that one million shares of one pound each in the purchasing company * * * shall be allotted to the vendor as consideration for the sale of the properties therein mentioned. * * *"

Following this and other recitals, the principal agreement made by the promoting agent is in terms adopted and ratified by the newly created corporation, and Butcher, the promoter, is discharged from all liability imposed upon him by the principal agreement. These last agreements are complete in themselves, and provide for the organization of a corporation, and the sale of Stratton's mining properties to it, and nothing more.

Another contract, of April 27th, between Stratton and the Venture Corporation, relates primarily to the disposition of Stratton's stock. It refers to the agreement of same date between Stratton and Butcher, and recites that thereby "the vendor [Stratton] has agreed to sell to the limited company to be formed as therein mentioned the properties therein described at the price of £1,000,000 to be satisfied by the allotment of 1,000,000 fully paid shares of £1 each in the said company, which is to be called 'Stratton's Independence, Limited,' * * *"; and then, for certain considerations in the nature of services to be rendered and advances to be made by the Venture Corporation, an option

for the period of 18 months is given it by Stratton to effect sales of his 1,000,000 shares, or any part of them, on the terms, namely, £1.16.0 per share for the first 666,666 shares, and £2.8.0 for the remaining 333,334 shares, net to Stratton; the Venture Corporation to retain for its commissions all it may realize above those figures, except that, if it should sell any of the shares for a price in excess of £2.10.0, three-fifths of such excess should be accounted for to Stratton. Further details of this agreement are unnecessary for the purposes of this opinion.

As in the original abandoned contract between Stratton and Reed, so in this, a depositary in the city of London is provided for, to hold Stratton's shares, with transfers so arranged as to permit of ready and convenient delivery whenever sales should be made. As in that contract, so in this, it was distinctly provided that, if any of Stratton's shares should remain unsold at the end of the option period, the same should be immediately delivered back to Stratton. As in that, so in this, a minimum of Stratton's net returns for stock to be sold under the option was fixed, but the maximum depended upon the success of the undertaking. It thus appears that Stratton, by a contract made between him and plaintiff corporation, agreed to, and did, sell his mines for 1,000,000 shares of its capital stock, and that by another separate contract between Stratton and the Venture Corporation, with which the plaintiff corporation had no concern, he agreed that the last-named corporation might make an attempt to sell these shares for him so as to realize a liberal commission for itself in so doing, and as much over a fixed minimum as possible for Stratton. In the event the attempt should fail, Stratton was to keep his stock, or otherwise alienate it, as he pleased. Whether the proposed attempt to sell it succeeded or failed was of no concern to the plaintiff corporation. The mines belonged to it, and the shares to Stratton. They took their chances as to value and the ultimate outcome of the property mutually exchanged.

After the stock was issued to Stratton pursuant to the terms of these executory contracts, and when he, by the document of date June 9, 1899, delivered his 1,000,000 shares to the depositary, agreed upon, with instructions to facilitate their sale by the Venture Corporation, he stated what seems to us to be the true situation resulting from all the prior contracts, as follows:

"Except as far as may be necessary for the carrying into effect the arrangements herein, the said shares are for all purposes to be considered the absolute property of me the said W. S. Stratton and all dividends payable in respect of such shares, except those as are sold cum dividend, are to be remitted by you to me as I may direct and I or my nominees or my representatives are and am to have the sole right of voting in respect of the said shares or such of them as may from time to time be unsold."

By the contract of April 18, 1900, between Stratton and the Venture Corporation, the latter, after reciting that it had already disposed of 592,500 shares of Stratton's stock under the option contract of date April 27, 1899, enters into an engagement, and purchases from Stratton all his remaining stock at such a sum as, with that before then received by Stratton for sales made under the option contract, aggregates the total sum of $10,000,000. In other words, this final contract shows

that, as a result of all the contracts relied upon by plaintiff in its replication, and of the proceedings taken thereunder, Stratton ultimately received $10,000,000 for his stock in the plaintiff corporation. But certainly this did not come about proximately by reason of the contract of sale between him and the plaintiff corporation, but rather as a result of the option contract and its successful execution. Whether Stratton's contract with the corporation was for an exchange of his mines for its stock, or for a sale of his mines to it for £1,000,000, to be satisfied by an issue of a million shares of its stock (and certainly it is one or the other), when the contract was executed and the properties exchanged an indefeasible title to the mines was secured by the corporation, and a like indefeasible title to the stock was secured by Stratton. Plaintiff corporation thereafter, as an independent entity, could operate, sell, or otherwise dispose of its properties; and Stratton thereafter, without the consent or co-operation of the corporation, could retain or alienate his stock at pleasure. If, in alienating any of it, he either directly or indirectly deceived purchasers, to their injury, by false representations concerning its value, he became liable to such purchasers therefor. Any money which he received for stock sold came from the vendees of the stock, and not from the plaintiff corporation. Moreover, plaintiff, as an artificial entity, owed no fiduciary obligations to the shareholders, except to protect their legal title to shares owned by them by giving proper attention to transfers and reissues of shares. 2 Thompson's Commentaries on the Law of Corporations, 2, § 2486, and cases cited. It was not the duty or within the power of plaintiff corporation to prevent the Venture Corporation or Stratton from selling any of the stock in question for any price they could obtain, and any rights of action which might accrue to any purchaser by reason of representations made in so doing in no manner redound to plaintiff.

In view of the earnest contention of plaintiff's counsel that all the contracts and documents set out in the replication, when taken together and properly understood and interpreted, lead to the conclusion that the sale was made to plaintiff corporation for $10,000,000 in money, we have given to them our most patient and careful consideration. We have given the language employed its fair and natural meaning; we have considered every fair and reasonable inference that may be drawn from them; we have regarded the rule of construction requiring the consideration of all parts of written documents in their relation to each other and to the object sought to be accomplished; and, as a result, we are unable to find any substantial support for the averment in the replication that the real transaction was the plaintiff sold and disposed of its capital stock for $10,000,000, and paid over that sum to Stratton for his mining properties. It appears incontrovertibly that plaintiff had nothing to do with the sale of its stock after it was once issued to Stratton, that it never received or had any interest in any of the proceeds of such sale, and that the $10,000,000 which Stratton ultimately received as a result of such sale did not directly or indirectly come from the plaintiff, but came from divers individuals who purchased the stock from him. Plaintiff, therefore, cannot occupy the attitude in this case of having paid any money to Stratton. It exchanged 1,000,000

shares of its capital stock for his mines. What money Stratton received came from independent investors in that stock, to whom he may or may not be under obligations.

We have also had regard to all facts well pleaded in the replication, other than the contracts and documents set out, and, as a result of all, we are unable to find anything in the replication to the second defense which is sufficient in law to avoid its legal effect.

Many other questions are presented by the assignment of errors, but their decision either way cannot make the second defense bad or the replication good.

The conclusion is that the learned trial court committed no error in rendering a judgment on the pleadings in favor of the defendants. Its judgment is accordingly affirmed.