## ARMSTRONG v. LONE STAR REFINING CO. et al.*

Circuit Court of Appeals, Eighth Circuit.
May 23, 1927.

No. 7624.

1. **Appeal and error** ⟨⟩162(1)—**Creditor's acceptance of dividend paid on general claims held not estoppel to prosecute appeal from order denying preference.**

Creditor, appealing from order in receivership proceeding allowing his claim generally, but denying preference, by accepting dividend paid on claim as a general claim did not estop himself from prosecuting appeal.

2. **Appeal and error** ⟨⟩162(3)—**Rule precluding party accepting benefits of judgment from appealing therefrom, has exception where party is in any event entitled to sum received.**

The rule that a party, who enforces or otherwise accepts the benefit of a judgment, order, or decree, cannot maintain a writ of error or appeal to review such decree, has an exception where appellant or plaintiff in error is concededly entitled in any 'event to the sum which he has received.

3. **Assignments for benefit of creditors** ⟨⟩310(4)—**Person furnishing crude oil to refining company being operated under so-called trust agreement for benefit of creditors held entitled to preferred claim for value thereof as expense of administering trust.**

Where principal creditors of refining company and others, officers, directors, and stockholders, entered into a so-called trust agreement, turning property over to trustees to be operated for benefit of creditors and others interested, *held*, one supplying crude oil to trustees was entitled to preferred claim for value thereof as part of expense of administering trust, notwithstanding claimant was not a party to the trust agreement, had no knowledge thereof until after oil was furnished, and notwithstanding he took trade acceptances of refining company after learning of trust agreement; the business being conducted generally in the company's name.

4. **Appeal and error** ⟨⟩1022(1)—**Findings of master, approved by trial court, will not be lightly disturbed on appeal.**

Findings of master, clearly acquiesced in and approved by trial court, will not be lightly disturbed by appellate court.

5. **Appeal and error** ⟨⟩1022(4)—**Where findings of master and trial court conflict, appellate court has duty to determine facts for itself.**

Where there is a real or apparent conflict between findings of master and those of trial court, appellate court has duty to examine evidence and determine facts for itself.

6. **Assignments for benefit of creditors** ⟨⟩52—**Validity of trust created for benefit of creditors held not affected by absence of formal conveyances to trustees.**

Where principal creditors of oil-refining company and others, stockholders, officers, and directors, entered into so-called trust agreement, under which property was to be operated for benefit of all, fact that no formal instruments of conveyance were made passing title to trustees did not affect validity of trust.

7. **Assignments for benefit of creditors** ⟨⟩310(4), 364—**Trustees, on appointment of receiver, should have made accounting to court, and court should have required unpaid expenses of trusteeship to be paid by receivers before distribution.**

Trustees, operating oil-refining company under trust agreement for benefit of creditors and stockholders, on appointment of receiver, should have presented to court making appointment their account, showing receipts and disbursements during trusteeship, and showing any unpaid expense, and in such case court should have ordered unpaid expenses to be paid by receivers before making distribution to creditors.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Creditors' bill against the Lone Star Refining Company, wherein James R. Armstrong intervened, asserting a preferred claim. From a decree allowing the claim of intervener generally, but denying preference he appeals. Cause remanded, with instructions.

H. L. Stuart, of Oklahoma City, Okl. (W. A. Ledbetter, R. R. Bell, and E. P. Ledbetter, all of Oklahoma City, Okl., and C. E. Cooper, Bird S. McGuire, and E. P. Marshall, all of Tulsa, Okl., on the brief), for appellant.

Frank L. Bates, of Kansas City, Kan. (James F. Getty, of Kansas City, Kan., on the brief), for appellees.

Before BOOTH, Circuit Judge, and FARIS and DAVIS, District Judges.

BOOTH, Circuit Judge. February 26, 1921, a creditors' bill was filed against appellee the Lone Star Refining Company in the United States District Court for the District of Kansas. Receivers were shortly appointed. January 4, 1923, an order was made requiring creditors to file their claims, and requiring any creditor who demanded a preference for his claim to file an intervention bill.

Pursuant to the court's order, appellant filed a petition in intervention, setting up his claim, which consisted of three trade acceptances, amounting in the aggregate to $35,407.55. Each of the acceptances drew interest and provided for an attorney's fee in case of collection through an attorney. Issue was joined, and the matter was referred to a special master, who made a report, filed April 29, 1925, recommending that the claim be allowed as a general claim only, without preference.

*Rehearing denied August 30, 1927.

Exceptions to the master's report were heard by the court and overruled. The court by its decree, filed April 30, 1926, allowed the claim as a general claim without priority, denied attorney's fees, and denied interest, unless the estate should be sufficient to pay priority demands in full, pay the principal of all general claims, and leave a surplus, in which event interest should be paid pro rata on the general claims. The financial condition of the estate has shown that no such outcome is possible. From the decree of April 30, 1926, the present appeal was taken, July 29, 1926.

[1] On July 28, 1926, the court made an order in the main suit, directing the receivers to pay a 20 per cent. dividend on general claims. The intervener was paid, and he retained, this dividend on his claim. Motion is made in this court by appellees to dismiss the appeal, on the ground that appellant, having accepted the dividend, is now estopped to prosecute the appeal from the decree which allowed his claim and in accordance with which his dividend was paid.

[2] The well-settled rule that a party who enforces, or otherwise accepts the benefits of, a judgment, order, or decree, cannot afterward maintain an appeal or writ of error to review the same, is subject to numerous qualifications and exceptions. The rule has no application to a case where the appellant is concededly entitled in any event to the sum which he has received. 3 C. J. 682, § 556; United States v. Dashiel, 3 Wall. 688, 702, 18 L. Ed. 268; Embry v. Palmer, 107 U. S. 3, 8, 2 S. Ct. 25, 27 L. Ed. 346; Reynes v. Dumont, 130 U. S. 354, 394, 9 S. Ct. 486, 32 L. Ed. 934; Carson Lumber Co. v. St. L. & S. F. R. Co., 209 F. 191 (C. C. A. 8); Snow v. Hazlewood (C. C. A.) 179 F. 182. This exception to the general rule is recognized in the cases cited by appellees. Spencer v. Babylon R. Co. (C. C. A.) 250 F. 24; In re Minot Auto Co., 298 F. 853 (C. C. A. 8).

In the case at bar the face amount of the claim of intervener is undisputed, and its validity as a general claim is also undisputed. Whether intervener succeeds on his present appeal or not, he will be entitled to share with the other creditors, at least on the basis of the allowance of his claim as a general one. This being the situation, the intervener is within the exception noted to the general rule above stated. The motion to dismiss the appeal must therefore be denied.

[3] Turning to the merits: Was intervener's claim entitled to preference? The facts in the case are largely undisputed. The Lone Star Refining Company, a Kansas corporation, owned and operated a refinery at Wichita Falls, Tex. In the fall of 1920, it was in financial straits. A meeting of the principal creditors was called, the situation was discussed, and finally an agreement was entered into November 8, 1920. This agreement was signed by seven of the creditors, owning the large bulk of the indebtedness, by the Lone Star Refining Company, by five persons as "officers, directors, and stockholders" of the company, and by two individuals, Goebel and Getty, who were appointed by the instrument to act as trustees. The character of this agreement was somewhat peculiar. It recited the financial condition of the corporation; that a forced sale would result in great loss to the creditors, as well as to the company; that the business, if properly handled, could produce a profit; that the corporation had signified its assent to the placing of all its property, real and personal, including its business, in the hands of trustees, with full power and authority on the part of the trustees to manage and conduct the business as a going concern, to apply the proceeds and profits arising from the operation of the business to the payment of the debts of the seven creditors above mentioned, and also to the payment of other claims and debts of the corporation, until all were paid; that the term of the trusteeship, however, was to continue for a period not longer than two years.

By this instrument, the seven creditors agreed that they would extend the time of payment of their claims (amounting to upwards of $770,000) from time to time, and that they would not demand payment of their debts, nor institute suits to collect the same; that they would turn over any stock of the corporation which they held as collateral to the trustees. The corporation and the parties designated as "officers, directors, and stockholders" agreed that no further issue of stock should be made; that during the trusteeship they would not make any mortgage or deed of trust, or create any lien against the property; that they would turn over all of the property, both real and personal, to the trustees, and the corporation would make deeds of the real estate upon request; that they would by proper resolution of the board of directors confer upon the trustees full authority and power to continue, operate, and manage the business, and would render full assistance. The trustees agreed that they would and did accept the trust; that they would take over the property and protect it, would manage and operate the business, and pay out and distribute the profits as above noted.

The object of the agreement and trusteeship was declared to be "to secure the payment of the claims and indebtedness due the respective first parties (the seven creditors) and all other indebtedness of said second party (the corporation) out of the proceeds and profits of the said business; to conserve the property, assets, and business of said second party; and to organize, operate, and carry on the business of said second party upon an efficient and economical basis, until the indebtedness of said second party now existing has been fully paid and extinguished out of the proceeds and profits arising therefrom."

E. W. Goebel and James F. Getty were appointed trustees. They were granted full power to manage and control the property, assets, and business, "except, however, that said trustees should have no power to sell or dispose of any of the property or assets of said second party, or to create any indebtedness other than in the regular course and conduct of its business: Provided, however, that said trustees should conduct, carry on, manage, and operate the said business and affairs of the said second party whenever practical in the name of said second party (the corporation); the second party and its officers and directors, parties hereto, executing in the name of said second party any and all business papers, and doing any and all other acts necessary for the successful conduct of the business that might be requested or required of them by said trustees." The instrument further authorized and directed the trustees to pay out of the profits of the business $20,000 a month pro rata to the seven creditors, and also to pay "upon the other indebtedness of second party, now outstanding, such sums or amounts, as in the judgment of said trustees can be paid without crippling of embarrassing the successful conduct or operation of the said business: * * * Provided, further that the said trustees shall pay all current bills of said second party now existing and incurred in the operation of the said business, and all current bills incurred by said trustees in the operation and carrying on of said business, promptly and regularly and in no event permit any indebtedness so incurred to accumulate or jeopardize the interest of the main creditors of second party." The instrument further provided that, when the trusteeship should end, the trustees should make full, true, and complete accounting of their operation and conduct of the business. The five persons, who were described in the instrument as officers, directors, and stockholders of the company, included Getty and Goebel, who were appointed by the agreement as the trustees.

Counsel on both sides are at a loss for a name by which to designate the foregoing agreement. It has many of the earmarks of a common-law assignment for the benefit of creditors: There is an assignor; there are trustees; there are creditors; there is a purpose expressed that the trustees are to pay the creditors of the assignor. Usually, however, in an assignment for the benefit of creditors, there is contemplated a sale of the property and a distribution of the proceeds amongst the creditors. In this case, however, it is expressly provided that there shall be no sale, but merely a management of the business of the assignor for a limited period, for the purpose of paying creditors out of the profits derived from the operation during that period.

It has been suggested, and the suggestion is not without plausibility, that the agreement created a partnership between the company and the creditors who signed the agreement, and that the trustees were the agents of the partnership so created. We do not find it necessary to give a precise and specific legal name to the instrument of agreement. On its face it was a trust agreement, and we shall refer to it as such. There is no suggestion in the report of the special master, or in the decision of the trial court, that the agreement was invalid; nor is any such contention made in this court. Of course, it was not binding upon creditors who did not assent thereto. The trust agreement by its terms went into effect at the time of its execution, November 8, 1920, and continued until receivers were appointed, February 26, 1921.

The master found: "Pursuant to this agreement, the trustees did take charge of the management of the company on December 1, 1920, and proceeded to exercise supervision over the affairs of the company until the 26th day of February, 1921, when receivers were appointed in the United States District Court for the District of Kansas; said receivers forthwith taking possession of all the property of the company."

The court in its memorandum decision on exceptions to the master's report found: "By the terms of this agreement the property of the Lone Star Company did not pass into the custody of the trustees therein named by a transfer or assignment of the same, nor did said trustees take actual physical possession of said property."

[4, 5] Findings of a master, clearly acquiesced in and approved by the trial court, will not be lightly disturbed by this court. But,

where there is a real or apparent conflict between the findings of the master and those of the court, it is our duty to examine the evidence and determine the facts for ourselves.

We have examined the evidence in the present case, and in our judgment it clearly shows that the trustees took supervision and control of the business of the company under the trust agreement, and took such possession of the property as was necessary to insure that control. It is true the evidence does not disclose any deeds or instruments passing title to the real estate or to the personal property from the company to the trustees. But the evidence does disclose that the trustees assumed control of the business and directed how it should be run, directed what superintendents and employés should be retained and what ones should be dispensed with, kept in touch with actual operation to see that the employés were getting "the right percentages of the stuff," directed whether to sell or not to sell, watched the collections, insisted on getting what was due, and directed what bills should be paid. Extravagances and waste were curbed; profits were made until a few days before the appointment of the receivers; and a large amount of indebtedness was paid off from the receipts of the business. The business was carried on in the name of the company, as was provided in the trust agreement.

Other material facts, which were found by the master and approved or acquiesced in by the trial court, are that between December 1, 1920, and February 26, 1921 (the period of the trusteeship), the intervener furnished crude oil as raw material for use in the plant which was being operated by the trustees. (Appellees claim, and the evidence seems to support the claim, that this crude oil was furnished between December 1, 1920, and January 5, 1921.) The value of the material so furnished was $35,407.55. No payment was made therefor, although the three trade acceptances were given as above stated, dated January 24, 1921, and February 9, 1921. The intervener did not get knowledge of the trust agreement until on or about January 5, 1921. He at once took legal steps to secure his claim by attachment. His attorney, after conferences with a number of the large creditors above mentioned, and with one of the trustees, did not proceed with the attachment.

The intervener contended before the master that the creditors at the conference promised that his claim should have a preference. The master found that the creditors did not so agree. We accept the finding. However, the evidence is undisputed that the intervener was induced by the creditors, who were at the conference to forego proceedings with his attachment suit.

There are still other facts which we think are material, and which are clearly established by the evidence, but which were not included in the findings of the master:

(a) That it was the opinion of all parties interested that it would be of benefit to all of the creditors, as well as to the Refining Company, that the plant should not be closed down, but should be kept in operation. This is shown by the recitals of the trust agreement by the allegations of the complaint in the creditors' suit, and by the order of the court appointing the receivers and requiring the plant to be kept in operation.

(b) The trust agreement was considered to be an effective means of securing the continued operation of the plant. This appears from the recitals in the trust agreement itself, and from the testimony of Getty and Goebel.

(c) The crude oil furnished by intervener was instrumental in conserving the estate of the Lone Star Refining Company for the benefit of all of its creditors.

(d) It was one of the duties of the trustees under the trust agreement to pay promptly the current operating expenses.

(e) During the period (December 1, 1920, to January 5, 1921) in which this material was furnished, the trustees had funds in their hands with which payment for the material could have been made, but the funds were diverted to the payment of antecedent indebtedness. This appears from the testimony of Getty.

In view of all of the foregoing facts, what are the principles of law which govern the rights of the parties?

The intervener claims that he should be a preferred creditor, for the reason that he assisted in conserving the estate of the company for the benefit of all its creditors; that he did this by furnishing crude oil, which was necessary to the carrying on of the business. The appellees take the position that the intervener's claim stands on the same footing as if the oil had been furnished by him to the company prior to the time when the trustees took possession.

It is argued by appellees that the intervener did not become a party to the trust agreement, and therefore can claim no rights or benefits thereunder. The answer to this contention is that there is no showing that the intervener was a creditor of the company on November 8, 1921, and therefore there is no

showing that he could have come in under the agreement of that date. That agreement was for the benefit of existing creditors, not future ones.

It is further argued by appellees that the taking by the intervener of the trade acceptances from the Lone Star Company after he learned of the existence of the trust agreement shows that he was dealing with the company, and not with the trustees. The answer to this contention is that intervener took the acceptances from the party in whose name the business was being carried on, and that the business was being carried on in the name of the company, in accordance with the provisions of the trust agreement.

[6] That the trustees entered upon the performance of the trust agreement we consider too plain for argument. The fact that no formal instruments of conveyance passed the title to the trust estate did not affect the validity of the trust. Perry on Trusts (6th Ed.) § 95. Nor is it material to the present inquiry that the trustees did not carry out all of the provisions of the trust. In good faith they undertook to conserve the property and business of the company in the interest of all of its creditors. They were authorized to carry on the business and did so. By necessary implication they were authorized to incur expense in the hiring of employés and in the buying of materials. Bills incurred for these purposes were part of the legitimate expense of administering the trust estate and payable out of the estate. The indebtedness created by the purchase of crude oil from intervener was one of the necessary expenses of administering the trust, and was payable as such out of the trust estate.

[7] Upon the appointment of the receivers (one of whom, it may be noted, was one of the trustees), the trustees should have presented to the court making the appointment their account, showing the receipts and disbursements during the trusteeship and showing any outstanding unpaid expense. If this had been done, the court unquestionably would have examined the account; if it found the same to be correct, and that the trust had been administered for the benefit of all the creditors, it would have ordered the unpaid expenses to be paid by the receivers before any distribution was made to creditors. Perry on Trusts (6th Ed.) §§ 910–913; Meddaugh v. Wilson, 151 U. S. 333, 343, 14 S. Ct. 356, 38 L. Ed. 183; Randolph v. Scruggs, 190 U. S. 533, 539, 23 S. Ct. 710, 47 L. Ed. 1165; Summers v. Abbott, 122 F. 36 (C. C. A. 8); Bramble v. Brett, 230 F. 385 (C. C. A. 8); In re A. J. Waterman Mfg. Co. (D. C.) 291 F. 589; United States v. Swope, 16 F.(2d) 215 (C. C. A. 8); White v. Hill, 148 Mass. 396, 19 N. E. 407; Clark v. Sawyer, 151 Mass. 64, 23 N. E. 726; T. T. Haydock Carriage Co. v. Pier, 78 Wis. 579, 47 N. W. 945.

The fact that the trustees failed to apply to the court that appointed the receivers for allowance of their accounts, including unpaid expenses, cannot destroy the equitable rights of the intervener. So far as his claim is concerned, he stands in the shoes of the trustees. If allowance would have been made to the trustees on account of the materials furnished by intervener, the allowance may be made direct to him. Randolph v. Scruggs, supra, page 539. Our conclusion is that the claim of intervener should have been allowed as a preferential one.

As to interest and attorney's fees: It is conceded by appellees that, if intervener is entitled to have his claim allowed priority, he is entitled also to interest and attorney's fees. It is therefore unnecessary for us to discuss the matter.

The cause is remanded, with instructions to modify the decree in accordance with the views expressed herein.