**ROOSEVELT et al. v. MISSOURI STATE LIFE INS. CO. et al.***

No. 10254.

Circuit Court of Appeals, Eighth Circuit.
Aug. 1, 1935.

C. E. Daggett, of Marianna, Ark. (J. B. Daggett, of Marianna, Ark., Walter Chandler and J. H. Shepherd, both of Memphis, Tenn., Daggett & Daggett, of Marianna, Ark., and Chandler, Shepherd, Owen & Heiskell, of Memphis, Tenn., on the brief), for appellants.

George B. Rose, of Little Rock, Ark. (Allen May and Warren Rogers, both of St. Louis, Mo., Richard B. McCulloch, of Marianna, Ark., and Rose, Hemingway,

*Rehearing denied Sept. 23, 1935.

Cantrell & Loughborough, of Little Rock, Ark., on the brief), for appellees.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

Appellees Missouri State Life Insurance Company and Burk Mann, trustee, commenced this suit in equity to foreclose a real estate mortgage deed of trust which secured payment of $240,000 and interest. The deed of trust covered lands in several counties in Arkansas. Defendants in the lower court were Hughes Investment Company, a corporation, Arthur F. Douglas, record owner of the land, and various individuals comprising a committee known in the record as the committee for the protection of holders of bonds sold through G. L. Miller & Co., Inc., and others. The Hughes Investment Company filed an answer denying the allegations of the bill for foreclosure. The committee and Arthur F. Douglas filed answer and cross-bill. The issues before us are those raised by this cross-bill and the answer thereto.

In the cross-bill it is alleged that the committee were the victims of a fraud perpetrated by the Missouri State Life Insurance Company and its representatives, in a transaction involving the exchange by the committee of property known as the Medical Arts building in Memphis, Tenn., for a consideration partly in cash and partly in a first mortgage note secured by a deed of trust on Arkansas lands. The committee demanded damages for fraud and deceit in the sum of $210,000.

The case was referred to a special master, with directions to take the testimony and to report findings of fact and conclusions of law. In due time the master made and reported findings to the effect that the fraud alleged had been committed, and that the committee had suffered damages thereby in the sum of $210,000. Exceptions to the report were filed, and the lower court, upon hearing, sustained all of the exceptions and filed findings of fact and conclusions of law of its own, and entered decree thereon in favor of the appellees, dismissing the cross-bill for want of equity, and decreeing foreclosure of the trust deed for the full amount of the debt thereby secured. From this decree, the cross-complainants appealed to this court, and, because of procedural defects, we reversed the judgment. Roosevelt v. Missouri State Life Ins. Co., 70 F.(2d) 939. On remand to the lower court, this defect was remedied, and thereupon the lower court again made findings of fact and conclusions of law which are identical with those formerly made, and entered decree of foreclosure and dismissed the cross-bill. The record having been perfected, the case is now before us on the merits.

To understand the relationship of the insurance company, the committee, and other parties, and the nature of the transaction in which fraud is alleged to have been perpetrated, it is necessary to detail some otherwise unrelated facts which appear in the court's findings, or from undisputed evidence.

A Mrs. Rees owned a lot in the business section of Memphis, Tenn. G. L. Miller & Co., of New York, investment bankers, made a specialty of taking mortgages upon urban property to secure bond issues which they sold, using the proceeds in financing the construction of buildings. This concern and Mrs. Rees became interested in the erection of a building on her lot in Memphis, to be called the Medical Arts building. To that end Mrs. Rees and a Mr. Sackett organized a corporation called the Madison Building Company, to which Mrs. Rees conveyed the lot. The Madison Building Company executed to G. L. Miller & Co. a mortgage to secure a bond issue amounting to $825,000. These bonds were sold to a great number of persons. Mrs. Rees at first took for her interest in the property a second mortgage, which she afterwards exchanged for preferred stock in the Madison Building Company. Before the building was completed, G. L. Miller & Co. failed. A receiver was appointed to take charge of the building in the suit of a mechanic's lienholder. The trustee for the bondholders intervened, and the receivership was extended for their protection. Other holders of mechanics' liens intervened. The Madison Building Company filed an answer, setting up that the mortgage was usurious.

A great part of the building had not been divided up by partitions, and with but little of it rented, the income was not adequate to pay the carrying charges. The total claims ahead of Mrs. Rees amounted to $1,010,500. In this condition of her affairs, she placed them in the hands of Fred Callahan, a lawyer in Memphis, Tenn., who made various unsuccessful efforts to refinance so as to save something for her, but accomplished nothing until he met

Burk Mann, who suggested to him that the Missouri State Life Insurance Company would be glad to exchange some of its lands in Arkansas for the office building in Memphis. Mr. Mann was a member of a firm of Arkansas attorneys who represented the life insurance company in its Arkansas foreclosure business, being regularly retained and on a salary basis. After considerable negotiations between the insurance company and Callahan, they entered into a contract on the 21st day of July, 1927, by which it was provided that Callahan was to deliver to the insurance company $850,000 in bonds, secured by a first mortgage on the Medical Arts building; that a corporation which he would organize, and which would execute the mortgage, would finish the building and clear it of liens, and to guarantee his so doing, he would deposit with the insurance company the sum of $31,000. In consideration of the delivery of the bonds, the insurance company was to pay Callahan $100,000 in cash, from which the $31,000 to be deposited to secure completion of the building was to be deducted, and convey to him by warranty deed, free of all liens except the taxes and assessments becoming payable after the year 1927, lands to be selected by Mann, of the value of $750,000, according to the cost to the insurance company on the day they were transferred to its real estate division after foreclosure. The insurance company also agreed that it would loan to Callahan $120,000 on $220,000 in value of the lands, valued as above set forth. The insurance company also agreed to convey to Callahan, or his nominee, lands which the insurance company carried on its books at a value of $430,000, which lands were to be used by Callahan in settling with the holders of the bonds on the Medical Arts building. The insurance company further agreed that it would give Callahan, or his assigns, an option to borrow $215,000 from the insurance company, which loan should be secured by a first mortgage on the $430,000 list of lands. The contract further provided that unless the deal should be concluded on or before October 15, 1927, it should become null and void at the option of the insurance company. This time was, on August 22, 1927, extended to November 15, 1927.

After this contract with the insurance company had been tentatively agreed upon, but before the date of the execution of the formal contract, Callahan had several meetings with the committee representing the bondholders of G. L. Miller & Co., appointed by the United States District Court at New York City in a bankruptcy proceeding of the G. L. Miller & Co. On July 17th and 18th, Callahan submitted to the committee a proposal for contract, and this proposal was accepted by the committee, but it was contemplated by the parties that a formal contract would be executed at a later date; and on August 3, 1927, the committee and Callahan entered into a formal contract which was, however, subject to the approval of the United States District Court for the Southern District of New York. By the terms of this contract, the committee agreed to transfer to Callahan the title to the Medical Arts building, free of liens, and as consideration for such transfer, Callahan agreed to pay the committee $170,000 in cash, and to deliver to the committee a first mortgage note for $430,000 to be executed by a corporation to be organized by Callahan and to be secured by a mortgage on approximately 8,500 acres of land theretofore acquired by the real estate division of the insurance company by foreclosure of first mortgages, the value of such lands to be ascertained by their cost to the insurance company.

On September 3, 1927, an agreement was entered into between the insurance company and the committee, in pursuance of the contract with Callahan, and by this contract the insurance company agreed directly with the committee that the insurance company would carry out its contract with Callahan. The committee hesitated to recommend to the court the confirmation of the contract, and demanded of Callahan that there either be more land included in the mortgage, or that the amount of the loan by the insurance company be increased from $215,000 to $240,000. On September 7, 1927, the insurance company agreed to increase the loan to $240,000 on the land conveyed, as the basis of the $430,000 mortgage, and on that date the insurance company delivered to the committee the appraisals and other information which Callahan had contracted to present not later than the date of the hearing before the court.

On the evening of September 8, 1927, Callahan had a long interview with the New York attorneys of the committee, as a result of which, and at the suggestion of the committee's attorneys that he "put in writing his statement as to the value of these lands in order that we could have something for the consideration of the

committee and of the court in definite form," he wrote to the chairman of the committee, Mr. Roosevelt, a letter which Mr. Foster, one of the committee's attorneys, helped him to prepare from the data at hand, in which he set forth accurately the acreage, the character of each tract of land, the amount of the original loan upon it by the insurance company, and the foreclosure cost. This letter shows that the lands aggregated 10,128 acres, appraised by the insurance company before its original loans were made at $889,158, and costing on foreclosure sales $430,378.36. At this interview, Callahan stated that he had not seen any of the lands on which the $430,000 mortgage was to be executed, but he presented letters from leading real estate firms in Memphis, Tenn., giving the average value of improved and unimproved lands in the counties where these lands lay. He embodied in his letter an analysis of these estimates, showing the value of cleared lands in Crittenden county $93.75 per acre, uncleared lands $17.50 per acre, and a similar average valuation for each of the other counties. Mr. Mann was present at the conference, but took no part in it, and stated in reply to inquiry that he knew nothing about the lands. He was requested to appear in court the following day, but declined so to do, saying that he could give the court no information.

Since the letter of September 8th was written by Callahan at the request of representatives of the committee, and was apparently intended to summarize in written form his statements as to the value and general character of the lands, and since it was prepared for the purpose of use by the committee and the court, and since no objection has appeared to its fairly representing what was said by Callahan, we shall again refer to it as the best and most accurate evidence of what he did say at this conference.

It is here observed that the letter lists each tract of land separately, classifies the acreage of each tract, and places a value on each class of land. For instance, tract No. 90 is listed as 1,800 acres cultivated land at $100; 200 acres pasture at $50; 200 acres timber at $30; 100 acres lake, no value. Tract No. 92 is listed as 160 acres cultivated land at $75; 100 acres almost cleared at $60; 60 acres timber at $40. Submitted with the letter were photostatic copies of inspectors' reports. These reports were those made by the insurance company's inspectors as the basis for making the original loans. The letter closes with the following paragraph:

"While I have not personally inspected any of the lands, and the information furnished you is based upon appraisals made by the Missouri State Life Insurance Company, and from other sources mentioned above, I feel that it is fair to assume that the Insurance Company employed competent inspectors, and that the appraisals made by said inspectors, which I herewith submit, furnish the best available data as to the value as of the date of inspection. I would further state that Mr. C. W. Watson, of Marx & Bensdorf, and Mr. C. F. Williams, of Bolton Smith & Company, have no personal interest in this matter and are both connected with old and reliable firms of Memphis, Tennessee."

On the next day, Mr. Roosevelt, chairman of the committee, and Mr. Callahan appeared before the United States District Court, Judge Mack presiding, and a hearing was had. Some of the bondholders objected to the proposed arrangement, calling attention to the fact that the farm lands were of very little value at that time, and that they did not think the Memphis property should be exchanged for farm land, but the court finally approved the arrangement on condition that the loan should be increased from $215,000 to $240,000, and that the committee should not be required to bid for the Medical Arts building more than $500,000. At this hearing, the letter of Callahan to the committee was read in open court, and Mr. Callahan was interrogated by Judge Mack relative to the properties. The court inquired of the committee whether it had had an inspection and appraisements of the land and Mr. Roosevelt replied that they had not, but that they could have the lands appraised in ten days at a cost of $500. He asked for no postponement of the hearing in order that an appraisement might be made, and the proposed exchange was finally approved by the court.

Following this meeting in New York, Callahan returned to Memphis and organized the Hughes Investment Company, to which the 10,128 acres of land were conveyed on October 28, 1927, and on the same day the Hughes Investment Company made a mortgage of $430,000 to William P. Metcalf and the First National Bank of Memphis, as trustees for the committee. The committee was required to exercise its option to borrow $240,000 on the lands

within ninety days, which option was extended by the insurance company from time to time at the request of the committee.

In May, 1928, the committee had an appraisement of the lands made, which showed in detail their condition and valued the whole at $258,550.50, and on October 27, 1928, after knowledge of the value fixed by this appraisement, the committee exercised the option to obtain the loan of $240,000. On October 30, 1928, the Hughes Investment Company, which held title to the land, executed a $240,000 mortgage on it to Burk Mann as trustee for the insurance company. On October 31, 1928, the Hughes Investment Company conveyed the land to Arthur F. Douglas as agent for the committee. The trustees in the $430,000 mortgage, at the request of the committee, subordinated it to the $240,000. The committee actually received the $240,000 January 9, 1928, less $20,000 to pay taxes that had accrued on the land and the expense of recording the mortgage and subordination agreement.

The committee gave no notice, either to the insurance company or to Callahan, of an intention to repudiate the transaction or to claim that they had been induced to enter into it by fraud, until the cross-complaint was filed in this cause on January 24, 1930, and the Hughes Investment Company remained in possession of the lands until their conveyance to Douglas as agent for the committee, and the committee then continued in possession of the property, receiving the rents and profits until a receiver was appointed in this cause on the 9th of November, 1929. It is to foreclose this $240,000 mortgage that this suit was brought.

The questions on this appeal may be grouped as follows: (1) Whether the findings of the master were reviewable by the District Court, and, if so, to what extent; (2) whether the Missouri State Life Insurance Company, by fraudulent misrepresentation or concealment through Callahan and Mann, or either, mislead the committee as to the condition and value of farm lands; and (3) whether the appellants by their acts have waived their right to sue for damages for fraud and deceit, or are estopped so to do.

The contention of appellants that the findings of the master were not reviewable by the lower court was, we think, disposed of adversely to the appellants by this court on the former appeal. Roosevelt v. Missouri State Life Insurance Co., 70 F.(2d) 939.

Equity Rule 61½ (28 USCA following section 723) specifically provides that: "The report of the master shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment is fully satisfied that error has been committed."

■ True, the rule provides that when a case or any issue is referred by consent, and the intention is plainly expressed in the consent order that the submission to the master is as an arbitrator, the court may review the same only in accordance with the principle covering a review of an award by an arbitrator; otherwise, the report of the master is not conclusive, but only advisory, and is subject to review by the court, and the court may either approve or disapprove, modify, or recommit the report, or it may do as it did in this case, disaffirm the report, act upon the evidence reported, and enter its own findings. Boesch v. Graff, 133 U. S. 697, 10 S. Ct. 378, 33 L. Ed. 787; Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Armstrong v. Lone Star Refining Co. (C. C. A. 8) 20 F.(2d) 625; Parker v. Interstate Trust & Banking Co. (C. C. A. 5) 56 F.(2d) 792; Roosevelt v. Missouri State Life Ins. Co. (C. C. A. 8) 70 F.(2d) 939; Holt Mfg. Co. v. C. L. Best Gas Traction Co. (D. C.) 245 F. 354; Edwards Co. v. La Dow (C. C. A. 6) 230 F. 378; Stokes v. Williams (C. C. A. 3) 226 F. 148; Byers v. Federal Land Co. (C. C. A. 8) 3 F.(2d) 9; Simkins Federal Practice § 843.

■■ The report of the master, when submitted to the trial court, is clothed with the presumption of correctness, and if it is approved by the trial court it is clothed with the presumption of correctness in the appellate court, but where the trial court, notwithstanding this presumption, has disapproved and set aside the report, then it cannot be said that the presumption of correctness is attributable to it in the appellate court. That presumption is overcome by the adverse finding of the lower court, and we must accept the findings of the court as presumptively correct, although the presumption is doubtless weakened by the fact that its findings are in conflict

with those made by the master. Where, as in the instant case, findings of the master and the court conflict, it is the duty of this court to examine the evidence and determine the facts.

While this suit was commenced as one in equity, the issues involved are those arising on the cross-complaint of the appellants, by which they pleaded an action at law to recover damages for fraud and deceit. To entitle a party to recover in such an action, there must have been actual fraud resulting in damages. As said by us in Boatmen's Nat. Co. v. Elkins & Co., 63 F.(2d) 214, 216: "To sustain an action for damages for fraud and deceit, the representation made (1) must have been as to material facts; (2) it must have been knowingly false; (3) it must have been made with the intention that it should be acted upon by the person to whom made; (4) that person must have been ignorant of its falsity; (5) he must have relied on its truth; and (6) the false representation must have been the proximate cause of the injury or damage."

The elements and characteristics of such an action are well stated by this court in an opinion by Judge Hook in Kimber v. Young, 137 F. 744, 747, where it is, among other things, said: "To afford sufficient basis for an action of deceit the representation must have been of material facts, and must have had such relation to the transaction in hand as to operate as an inducement to the action or omission of the complaining party (Slaughter's Adm'r v. Gerson, 13 Wall. 379, 383, 20 L. Ed. 627; Smith v. Chadwick, 20 Ch. Div. 27); and it must have been relied on by him (Marshall v. Hubbard, 117 U. S. 415, 6 S. Ct. 806, 29 L. Ed. 919; Ming v. Woolfolk, 116 U. S. 599, 6 St. Ct. 489, 29 L. Ed. 740; Stratton's Independence v. Dines [C. C.] 126 F. 968, 977). The basis of the action of deceit is the actual fraud of defendant—his moral delinquency; and therefore his knowledge of the falsity of the representation, or that which in law is equivalent thereto, must be averred and proved. There is much confusion in the authorities upon this subject, due in part to the erroneous assumption that that which is merely evidence of fraud is equivalent to the ultimate fact which it tends to prove, and also to the assumption, likewise erroneous, that an untrue representation which would be sufficient to support a suit in equity for a rescission of a contract is equally as available in an action of deceit. * * * The false representation relied on as the ground of an action of deceit must have accomplished the purpose of deception. Ming v. Woolfolk, supra. The plaintiff must have used due diligence to discover for himself the truth or falsity of the representation (Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203), or the relations of the parties to each other or the location or character of the subject-matter of the transaction must have been such as to excuse investigation and to justify his reliance upon the assertion of the other. Again, the representation must be of existing and ascertainable facts, and not mere promissory statements based upon general knowledge, information, and judgment. Sawyer v. Prickett, 19 Wall. 146, 22 L. Ed. 105; Patent Title Co. v. Stratton (C. C.) 89 F. 174, 178. It was said in Union Pacific Ry. Co. v. Barnes [(C. C. A.) 64 F. 80], supra: 'An action for false and fraudulent representations can never be maintained upon a promise or a prophecy.' Nor is mere expression of opinion sufficient, though it be false, and be expressed in strong and positive language. Johansson v. Stephanson, 154 U. S. 625, 14 S. Ct. 1180, 23 L. Ed. 1009. Positive statements as to value are generally mere expressions of opinion and as such cannot support an action of deceit. Gordon v. Butler, 105 U. S. 553, 26 L. Ed. 1166; Blease v. Garlington, 92 U. S. 1, 9, 23 L. Ed. 521."

See, also, United States v. Beebe, 180 U. S. 343, 21 S. Ct. 371, 45 L. Ed. 563; Southern Development Co. v. Silva, 125 U. S. 247, 8 S. Ct. 881, 31 L. Ed. 678; Woods-Faulkner & Co. v. Michelson (C. C. A. 8) 63 F.(2d) 569; Boatmen's Nat. Co. v. Elkins & Co. (C. C. A. 8) 63 F.(2d) 214; Gleason v. Thaw (C. C. A. 2) 234 F. 570; Kell v. Trenchard (C. C. A. 4) 142 F. 16.

The charge of fraud is based upon certain alleged misrepresentations by Callahan as to the nature, character, condition, value, and income of these Arkansas farm lands at the conference held at the New York hotel on the evening of September 8, 1927, and in the District Court of New York on the following day. At the conference, Mr. Mann was present, and it is claimed that his silence was such as to imply an acquiescence of the Missouri State Life Insurance Company, which he represented, in the statements made by Callahan. It is important, in considering this testimony, to note the relation of the parties. The bondholders' committee consist-

ed of intelligent business men, who, in all they did, acted under advice of counsel. At this conference, they were represented by members of the committee and by at least three attorneys, and at the court hearing which followed, they were represented by eminent counsel. One of their attorneys had, prior to that time, been driven 150 miles through the territory where a considerable portion of the lands were located, and the committee had a local attorney at Memphis, Tenn. There were no trust relations between the parties, and they were at liberty to deal with each other at arms length. At the conference there was apparently a great deal of general discussion as to the land values. There was before the committee at this conference the report of the insurance company's inspectors on each of these tracts of land on which the insurance company had originally made a loan. This report contained an appraisal of each tract of land. There was before the committee evidence as to the amount of the loan originally made by the insurance company, the fact that the mortgage had been foreclosed, and the amount at which the property had been bid in by the insurance company. These reports of the inspectors classified the lands embodied in each tract and separately placed a valuation on each class of land. There were before the committee letters from certain real estate firms in Memphis, Tenn., giving an estimate of certain classes of land in the counties in which these properties were located, but giving no information as to these particular lands, and Mr. Roosevelt expressed the view that these real estate firms were reliable, and he seems to have had some acquaintance with certain of their members.

At that conference, Callahan specifically said that he had never seen nor inspected any of the lands in question. Mr. Foster, one of the committee's attorneys who attended the conference, in his testimony relative to this conference, says: "After a long conference preliminary, we suggested that Mr. Callahan put in writing his statement as to the value of these lands in order that we could have something for the consideration of the committee and of the court, in definite form."

In referring to the letter, this witness further says: "In preparing the figures, the analysis of the various tracts was obtained from the appraisal reports, with the exception of the foreclosure costs, which was merely a statement by the Missouri Life Insurance Company. Mr. Callahan then reduced the computation of the foreclosure costs, divided by the number of acres, to an average of slightly under $42.50. Then Mr. Callahan computed with my assistance the average value of cleared and uncleared land in the counties of Crittenden, Jefferson, Mississippi and Poinsett, taking the average values given by Bolton Smith and Marx & Bensdorf, and then applying these average figures for cleared and uncleared land to the amount of cleared or cultivated land on the one hand, and to the timbered and uncleared land, and obtained a value on this average valuation basis of $577,923.75, before making any allowance for the value of the improvements. He then took the aggregate value of the improvements as shown on the appraisal reports, $99,750.00, and added that figure to the total value of the lands without improvements, making a total valuation of $677,673.75."

The committee, therefore, knew exactly how the letter was prepared, and had in their hands the data from which it was compiled, and apparently accepted it as a summary in written, definite form of his statements as to the value of the lands. It was not only prepared at the suggestion of the committee for that purpose, but was used by the committee and the court as representing all that Callahan knew with reference to these properties. We have already adverted to the fact that Callahan at no time represented that he had any personal knowledge as to the character, condition, or value of these lands, and in his letter, after stating that he had not personally inspected any of the lands, he refers to the appraisals as made by the inspectors of the insurance company in the following language: "I feel that it is fair to assume that the Insurance Company employed competent inspectors and that the appraisals made by said inspectors, which I herewith submit, furnish the best available data as to the values as of the date of the inspection."

This is in the nature of an argument, and it refers to values, not at the time of the conference, but at the time the appraisals were made, which was in 1918 to 1920. The evidence indicates that either at the conference, or on the following day, he said that the lands throughout the delta were all alike and equally suitable for cotton farming. He said that the lands were

overflowed to a minor extent by a levee break. He also gave it as his opinion that the fair rental was $10 per acre for cotton lands. At the hearing before Judge Mack, Mr. Roosevelt, with his three attorneys, appeared, as did also Mr. Callahan. At this hearing, Judge Mack pointed out that there were no figures as to the present values of the lands, and that there were opinions only as to the general average of land in the counties. Callahan said he was making a statement from his knowledge concerning conditions in and about Memphis, his home, and that the lands involved were across the river; that he was not a land man, but a lawyer, but he was a large landowner and felt that he was qualified to say something at least concerning the prospects or future of farm lands in his section. He pointed out that during the World War, cotton planters were prosperous, and that after the war cotton sold for less than it cost to produce it; that planters lost their lands, but cotton had gone up very rapidly, and he expressed the opinion that there would be no telling where the end would be. He said: "Income from those 5600 acres of land should be between $15.00 and $10.00 per acre. I am speaking of usual conditions in the cotton belt, and the land rent usually runs from $10.00 to $15.00 per acre."

Here the court interrupted: "How much of that land is cotton land?" Mr. Callahan replied: "How much of it is cultivated?" This interrogation seems to have been addressed to Mr. Foster, one of the committee's attorneys. At any rate, Mr. Foster spoke up and said, "5,500 acres." Mr. Callahan then said his client (Mrs. Rees) reasonably should expect an income of from fifty to fifty-five thousand dollars from these lands. The court then said that the taxes and interest would amount to $36,000. Callahan said: "That would leave, your Honor, if my guess is right, that would leave some twenty or twenty-five thousand dollars, or fifteen or twenty thousand dollars of it to the present holders, with the prospect of things getting better, and how they can get worse I cannot imagine, and that would leave a margin above that."

The court asked about the levee break, and Callahan said that his understanding, from reliable sources, was that only one plantation was affected by the overflow. The court said: "You do not know what the effect on that particular parcel is, of the break?"

Callahan answered: "No, sir, your Honor, I do not; but I do know this, I know that plantations thirteen miles away from the bad break at Stops Landing, that the effect was beneficial in that it made the land more fertile and much better for planting purposes, and my own plantation was improved by the deposit of new soil or silt, as they call it on the plantation. Now, that is all I can say on that subject."

Referring to the statements from the Memphis real estate agents, the court said: "But none of these appraisals refer specifically to this land, they refer to the general average of lands in those counties."

Callahan then said: "Well, for six hundred miles, your Honor,—of course this is just my statement—but for six hundred miles the delta looks all alike, one plantation looks just like another, and the man who gives you his guess knows about the general values of the delta, and those appraisals cover almost completely the value of the particular plantations as if he had made a specific appraisal of these particular plantations."

In this entire recital, there cannot be said to be a statement of any present material fact. As to rental values generally, what Callahan said was less than an opinion—it was prophecy, and known to be such at the time the statements were made. In this connection he used the words "prospects or future." As to the statement with reference to the overflow of the lands, he disclaimed any knowledge, but stated the effect of overflow on lands some 13 miles distant from the break, and there is no suggestion of any proof that either of these statements were false. As to his general statement that for 600 miles the delta looks all alike, it is observed that he says: "Of course, this is just my statement." Mr. Foster had viewed these lands on his 150-mile drive, but, in addition to all this, the statement bears on its face evidence that it was given as a general statement, which was not intended to apply to individual peculiar differences in the various tracts. In fact, the court and the committee were advised by the very letter which Callahan had prepared, in which he summarized the appraisal reports of the insurance company, that these lands were not all alike. These appraisals showed valuation on cultivated lands from $75 to $150 per acre, and on timber land from $20 to $60 per acre. The letter which was read at the hearing showed that there were

not only timber lands and cultivated lands, but partly cleared tracts, roughly cleared tracts, cleared land, some "slashed" land, partly marshy; 760 acres in Poinsett county was described as being "unimproved, valued at $60.00 per acre in timber." Then, too, the letter from Bolton Smith & Co. showed that the average value of cultivated land in Jefferson county runs from $75 to $100 an acre, while cut-over lands in Jefferson county runs from $75 to $100 an acre; that cut-over lands and the woods lands would run from $10 to $25 an acre; that in Mississippi county the cultivated lands run from $100 to $150 an acre, and the woods lands from $15 to $40 an acre; in Poinsett county the cultivated lands run from $60 to $90, and the woods lands from $5 to $15. The Marx and Bensdorf letter contained similar data as to the various classes of lands shown by these reports in these various counties.

■ The appraisals furnished by the insurance company were in the hands of Mr. Foster for two days before the hearing, and he said he gave them careful examination and discussed them with certain members of the Root law firm, who were co-operating with him in the matter, and these appraisals showed variation in the lands, so that all the parties to the transaction had before them writings and documents showing that these general statements attributing a uniformity to the lands were not strictly accurate; in fact, Callahan refers to them as "just my statement." Neither Callahan nor any one present considered these general statements as literally true, and as stated by us in Kimber v. Young, supra, "The plaintiff must have used due diligence to discover for himself the truth or falsity of the representation," and here the evidence refuting the literal accuracy of this statement was before the parties and had been furnished by the witness himself. The parties were considering property which neither of them had seen. The committee, therefore, knew that any statements made by Callahan were not based upon personal knowledge, and it is not claimed that he did not correctly present the data upon which he based his statements, to wit, the reports of the inspectors for the insurance company and the letters from the Memphis real estate firms.

It is important in this connection to consider the situation of these bondholders. There were many of them, their individual holdings were small, and they were widely scattered. Their bonds were secured by a mortgage on the Medical Arts building in process of construction. The building contractor had ceased operations. There were liens upon the property superior to the mortgage that were being foreclosed by foreclosure suit then pending, in which a receiver had been appointed. There had been levied upon the building an execution for $56,000. There was a mechanic's lien of $29,000. There was $8,000 due for taxes. There were outstanding receiver's certificates to the amount of $32,000, while the bondholders held bonds aggregating $825,-000, on which there was due a year's interest, making a total indebtedness due the bondholders of $874,500. There was also expenses of litigation, including the allowances to the receiver, fees to the master for selling the property, and other items, bringing the total of prior lien items to $136,000. The building, being unfinished, was producing practically no revenue. In order to save the property even in its unfinished condition, it would have been necessary for the bondholders to raise $136,000 to pay off these prior liens and claims, and they had no means of raising this money. In this situation, they could have gone to sale under decree of foreclosure, but they would have had no means to pay the superior demands and would have lost the property entirely; or they could take from the Missouri State Life Insurance Company $410,-000 in cash, with the possibility of getting something out of the lands. Mr. Roosevelt, in his testimony, says: "In working out this deal with Mr. Callahan, it appears from the court proceedings that the Committee and I thought Judge Mack considered the Medical Arts Building down there worth approximately $400,000.00 to $450,000.00, somewhere in that neighborhood. * * * Litigation constituted a very material factor in inducing us to enter into this contract, I think. We had several propositions relative to the disposal of that building. This was the only deal we could make. * * * This was the definite deal. If we did not go into this deal another deal was very problematical."

Mr. Foster, when he appeared before Judge Mack, among other things said: "We were negotiating with three or four people who indicated an interest in the property. All of them indicated that they thought Four Hundred Thousand Dollars was as much as the building was worth."

Judge Mack at the hearing, responding to some statement by Mr. Foster, said: "That is, you can now get $240,000.00 from the Insurance Company, and $170,000.00, which would make $410,000.00, and then in addition to that you would have $190,000.00 in second mortgages."

At this hearing Judge Mack pointed out that the bondholders would get at least $300,000 in cash out of the $410,000 cash received from the insurance company. He then said: "We take off $110,000.00 maximum, which would leave $300,000.00 cash for the bondholders and $300,000.00 is 36 per cent. of the $825,000.00 issued. Now in addition to that there would be this second mortgage of $190,000.00."

It is apparent that Judge Mack attached no importance to the value of these lands. In his testimony in this case, Mr. Roosevelt was asked, in the form of a hypothetical question, whether he would have approved going before the court with the proposition if he had known of this later disclosure, and said, "I can't tell what I might have done three years ago."

[redacted] We have already pointed out that what Callahan said with reference to the character and value of these lands was in the nature of a general statement which, in view of his letter which classified all the lands, and his statement that he never had personally seen the lands, could not, we think, have been accepted or relied upon as statements of fact. At most, they were commendatory statements in the nature of trade talk and the expressions of opinions and prophecies. They do not constitute representations of present or past facts which can be relied upon. Byers v. Federal Land Co. (C. C. A. 8) 3 F.(2d) 9; Blease v. Garlington, 92 U. S. 1, 23 L. Ed. 521; Gordon v. Butler, 105 U. S. 553, 557, 26 L. Ed. 1166; Southern Development Co. v. Silva, 125 U. S. 247, 8 S. Ct. 881, 31 L. Ed. 678; Vulcan Metals Co. v. Simmons Mfg. Co. (C. C. A. 2) 248 F. 853; Deming v. Darling, 148 Mass. 504, 20 N. E. 107, 2 L. R. A. 743; Blakeslee v. Wallace (C. C. A. 6) 45 F.(2d) 347, 350; Van Weel v. Winston, 115 U. S. 228, 6 S. Ct. 22, 29 L. Ed. 384; Kimber v. Young (C. C. A. 8) 137 F. 744.

In Gordon v. Butler, supra, in an opinion by Mr. Justice Field, it is said: "The law does not fasten responsibility upon one for expressions of opinion as to matters in their nature contingent and uncertain. Such opinions will probably be as variant as the individuals who give them utterance."

In Kimber v. Young, supra, this court, in an opinion by Judge Hook, said: "Nor is mere expression of opinion sufficient, though it be false, and be expressed in strong and positive language. Johansson v. Stephanson, 154 U. S. 625, 14 S. Ct. 1180, 23 L. Ed. 1009. Positive statements as to value are generally mere expressions of opinion and as such cannot support an action of deceit."

"A statement of the monetary value of property with no definite market value such as a mine, an invention, old and used goods or of lands, is generally made and understood as an expression of opinion only, and not as representation of a fact, and is not ordinarily an actionable misrepresentation." Byers v. Federal Land Co. (C. C. A. 8) 3 F.(2d) 9.

What is said by the Circuit Court of Appeals of the Sixth Circuit in Blakeslee v. Wallace, supra, states the rule applicable to the facts disclosed in this case. It is there said: "Keeping in mind, always, that the essential and determinative intent must be not merely to influence the action of the plaintiff, but to actually deceive and mislead plaintiff in some definite particular, we think that the only representations upon which an action may be founded, whether they be representations of substantive fact or of opinion, hopes, intentions and beliefs, are those which, under the admitted relationship of the parties, the plaintiff has a right to accept as serious fact statement, as distinguished from 'puffing,' argumentative reasons, or sales talk. Known bias or interest plays a part. Whether the subject-matter of the representation is general or specific is also important. Equality of knowledge is usually presumed as to generalities. In order to support an action the representation must be one which the declarant intended to be understood, and the plaintiff had a right to understand, as importing a distinct obligation of accuracy or fulfillment. This is the criterion fixed by Sawyer v. Prickett, 19 Wall. 146, 163, 22 L. Ed. 105. Beyond that any belief by the plaintiff in the truth of the representation is unreasonable. Deceit is something more than mere credulity or misplaced confidence."

Considering the relationship of the parties, and all the surrounding facts and circumstances, we conclude that the committee had no right to rely on these general

statements made by Callahan when they had at hand information which clearly disclosed that these statements could not be literally true.

■ But there is another respect in which the evidence relied upon by the appellants is fatally defective. In the national courts a party suing for damages for fraud and deceit is not entitled to recover the value of his bargain, but can recover, if at all, the difference between the actual value of the property on the date of sale and the price paid. Sigafus v. Porter, 179 U. S. 116, 21 S. Ct. 34, 45 L. Ed. 113; Smith v. Bolles, 132 U. S. 125, 10 S. Ct. 39, 33 L. Ed. 279; Cooper v. Schlesinger, 111 U. S. 148, 4 S. Ct. 360, 28 L. Ed. 382; Nupen v. Pearce (C. C. A. 8) 235 F. 497; Stratton's Independence v. Dines (C. C. A. 8) 135 F. 449; Hindman v. First Nat. Bank of Louisville (C. C. A. 6) 112 F. 931, 57 L. R. A. 108.

■ In order to sustain an action in fraud and deceit, damages or injury must result because fraud without damage or injury is not actionable. The only evidence introduced by appellants as to the value of the Medical Arts property is an alleged appraisal reciting its fair market value as of August 16, 1927, at $513,750. The man who prepared the appraisal was not placed upon the stand and no foundation whatever was laid for the admission of this hearsay testimony; in fact, it scarcely reaches the dignity of hearsay because there was no proof that it was prepared by the person purporting to have prepared it. It is therefore wholly without any probative force. There are statements of members of the committee that this property was worth approximately $400,000 to $450,000. The burden of proof was upon appellants to prove that they suffered damage. They received $410,000 from the insurance company, and there is no substantial proof to show that the property with which they parted had a greater value than that amount. There is, therefore, a total failure of proof upon which to base any judgment for damages for fraud and deceit.

In view of the conclusions reached, any discussion of the other issues earnestly and ably presented by counsel would unduly extend this opinion, and serve no useful purpose.

The judgment appealed from is therefore affirmed.

SANBORN, Circuit Judge (concurring).

My initial examination of the record in this case created an inference in my mind that a fraud had been perpetrated upon the appellants. Further consideration, however, and the exhaustive opinion of Judge GARDNER has convinced me that a finding of actionable fraud could not be sustained under the evidence, and I therefore concur. I am still of the opinion, however, that the record shows that the appellants and Judge Mack were imposed upon with respect to these lands by Callahan, acting for the insurance company. This court, however, has long been of the view that in actions to recover damages for fraud, the misrepresentations must not only have been relied upon, but must have been of such a nature or made under such circumstances that the plaintiff had a right to rely upon them. In the case of Horton et al. v. Reynolds et al. (C. C. A. 8) 65 F.(2d) 430, the facts of which bear more than a slight resemblance to those here involved, we refused to permit the rescission of a sale of lands, due to the opportunity which the plaintiffs had to find out for themselves the character of the lands allegedly misrepresented. Obviously, common prudence required an examination and appraisal of these Arkansas lands by some unbiased person if their value was regarded as being of consequence. There was no real lack of opportunity for examination. If the appellants chose to rely upon the generalities of Callahan, who certainly bore no relation of trust to them, that was their privilege, but was at their own peril. In Attwood v. Small, 6 Clark & F., 232, 7 Eng. Rep. 684, referred to in Horton et al. v. Reynolds et al., supra, the House of Lords said: "The question is not as to waiver or acquiescence in fraud, but whether the parties have used that ordinary degree of vigilance and circumspection in order to protect themselves, which the law has a right to expect from those who apply for its aid." The following excerpt from the opinion of Mr. Justice Field in Slaughter's Adm'r v. Gerson, 13 Wall. 379, 383, 20 L. Ed. 627, is also appropriate: "A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own inattention and carelessness. Where the means of knowledge are at hand and equally available to both parties, and the subject of pur-

chase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations."